## SAN PEDRO, L. A. & S. L. R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 1, 1915. Rehearing Denied March 8, 1915.)

### No. 2412.

1. MASTER AND SERVANT ⟪⇒13—HOURS OF SERVICE ACT—VIOLATION.

Hours of Service Act March 4, 1907, c. 2939, § 2, 34 Stat. 1416 (Comp. St. 1913, § 8678), provides that telegraph operators in day and night offices on interstate railroads, who have to do with the movement of trains shall be permitted to remain on duty not exceeding 9 hours in any 24-hour period, "except in case of emergency," when they may be kept on duty for 4 additional hours each day for not exceeding 3 days in any week. Section 3 provides that the act shall not apply "in case of casualty or unavoidable accident." Defendant railroad company had on duty at a day and night office on its line three operators, each of whom worked 8 hours per day. One was taken suddenly ill, and no other operator could be obtained in the place. As soon as possible, which was the next day, the chief dispatcher sent a relief man; but the train was wrecked and he was ordered to establish an office at the wreck, causing further delay, in consequence of which the two remaining operators each worked 12 hours a day for 4 or 5 successive days. *Held*, that such extended time during the first 3 days was permissible under section 2, and the further delay was due to a casualty which, under section 3, rendered the act inapplicable, and that defendant was not chargeable with its violation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⟪⇒13.

Hours of service of employés, see note to United States v. Houston Belt & T. Ry. Co., 125 C. C. A. 485.]

2. MASTER AND SERVANT ⟪⇒13—HOURS OF SERVICE ACT—VIOLATION.

Defendant railroad company *held* not exempted from liability under Hours of Service Act, for keeping the conductor and brakemen in charge of a train on duty for 27 consecutive hours and until they reached the end of their run, by the fact of a landslide which made it necessary to run the train around over other lines, where, notwithstanding the detour, they could have been relieved several hours earlier.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⟪⇒13.]

3. MASTER AND SERVANT ⟪⇒13—HOURS OF SERVICE ACT—CONSTRUCTION.

In order to justify a carrier in keeping employés on duty beyond the time fixed by Hours of Service Act under the proviso of section 3, it must show that the same was not in any respect occasioned by the lack of that high degree of care and foresight properly required of a carrier.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14 · Dec. Dig. ⟪⇒13.]

In error to the District Court of the United States for the Southern Division of the Southern District of California; Olin Wellborn, Judge.

Action by the United States against the San Pedro, Los Angeles & Salt Lake Railroad Company to recover penalties. Judgment for plaintiff, and defendant brings error. Reversed in part.

⟪⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

A. S. Halsted and James E. Kelby, both of Los Angeles, Cal., for plaintiff in error.

Albert Schoonover, U. S. Atty., and Harry R. Archbald, Asst. U. S. Atty., both of Los Angeles, Cal., and Monroe C. List and Philip J. Doherty, Sp. Asst. U. S. Atty., both of Washington, D. C., for the United States.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. Two actions brought in the court below by the government against the San Pedro, Los Angeles & Salt Lake Railroad Company—one there numbered 106 and the other 243—were consolidated for trial before the court with a jury, and were submitted upon an agreed statement of facts and upon the uncontradicted testimony of one witness, sworn on behalf of the plaintiff in the action. The cases have also been submitted together here. Both actions were based upon the act of Congress known as the "Hours of Service Act," approved March 4, 1907, entitled "An act to promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon" (34 Stat. 1415). The complaint in case numbered 106 contained five counts, one of which was withdrawn by the plaintiff, and in respect to one of which a verdict for the defendant company was returned under instructions of the court, leaving the first three counts of that complaint for consideration here.

The second section of the act of Congress provides:

"That it shall be unlawful for any common carrier, its officers or agents, subject to this act, to require or permit any employé subject to this act, to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employé of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; and no such employé who has been on duty sixteen hours in the aggregate in any twenty-four' hour period shall be required or permitted to continue or go again on duty without having had at least eight consecutive hours off duty: Provided, that no operator, train dispatcher, or other employé who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers, offices, places and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the daytime, except in case of emergency, when the employés named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four hour period on not exceeding three days in any week."

The third section provides the penalties for violations of the provisions of section 2 and for prosecutions of such violations, and contains two provisos, the first of which is as follows:

"Provided, that the provisions of this act shall not apply in any case of casualty or unavoidable accident or the act of God, nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employé at the time said employé left a terminal, and which could not have been foreseen."

[1] The first count of the complaint in case numbered 106 alleges, among other things, that the defendant company, during the 24-hour

period beginning at 8 o'clock a. m. of January 19, 1911, required and permitted its telegraph operator at Kelso, Cal.—one Grandee—to be and remain on duty for a longer period than 9 hours in said 24-hour period, to wit, from 8 o'clock a. m. to 8 o'clock p. m. of said 19th day of January; that Kelso was at that time a continuous night and day telegraph station; and that Grandee, while so required and permitted to remain on duty during the said 12 hours, by the use of the telegraph or telephone dispatched, reported, transmitted, received, and delivered orders pertaining to and affecting the movement of trains engaged in interstate commerce. The second and third counts of that complaint contain similar averments in respect to the defendant company's operator Dugan, of whom, in the second count, it is alleged that he was required and permitted to be on duty as such operator at the same station from 8 o'clock p. m. of January 19, 1911, to 8 o'clock a. m. of January 20, 1911, and in the third count that Dugan was required and permitted to be on duty as such operator from 8 o'clock p. m. of January 20, to 8 o'clock a. m. of January 21, 1911.

The answer of the defendant company as amended set up in substance this justification of its action: That at the time in question the force of telegraphers employed at Kelso consisted of an agent operator, whose regular hours were from 8 o'clock a. m. to 4 o'clock p. m., and two other telegraph operators, whose hours were from 4 o'clock p. m. to 12 o'clock midnight, and from 12 o'clock midnight to 8 o'clock a. m., respectively; that on January 16, 1911, one Starkey, one of the regular telegraph operators at the station mentioned, whose hours were from 4 o'clock p. m. to 12 o'clock midnight, was taken suddenly ill and became incapacitated for service; that Kelso is a helper terminal and important telegraph station, continuously operated day and night; that at the time Starkey was taken ill there was no available operator at Kelso to replace him, and that it was necessary for the company to procure another operator and send him to Kelso; and that as soon as possible the defendant did procure an operator named Ham and sent him to Kelso for service to take the place of Starkey, and that Ham began his service as soon as possible, to wit, January 20, 1911—by reason of all of which an emergency arose and existed, which made it imperative for the defendant company to require the said Grandee to work overtime as alleged in the complaint. A similar answer and alleged justification was pleaded by the defendant company to the second and third counts of the complaint in case 106.

The evidence showed the facts to be that Kelso is a station of the defendant company on the desert 236 miles east of Los Angeles, situated between the stations Crucero and Las Vegas, and was at the times in question a continuous day and night office of the company; that Grandee was the agent of the company at that station, as well as one of the telegraph operators—Dugan and Starkey being the other two operators—in receiving and transmitting telegraph orders pertaining to and affecting the movement of trains passing between Nevada and California. We extract from the uncontradicted testimony of the witness Smith, who was chief clerk of the superintendent of the defendant railroad company, as follows:

"The two men (Grandee and Dugan) were kept on overtime because one of the operators, W. F. Starkey, became ill on January 16th. At this time the office at Kelso was under the supervision of the chief dispatcher at Las Vegas. When Starkey was taken ill, and the chief dispatcher at Las Vegas was apprised of the fact, he wired to Los Angeles on the morning of the 17th, asking for a relief operator. He wired the superintendent of telegraph, who employs the telegraph operators. The superintendent of telegraph did not secure a man to take Starkey's place at Kelso, and on the evening of the 17th the dispatcher at Las Vegas borrowed an operator who was employed in the Las Vegas telegraph office, and started him to Kelso that night. This was the first train from Las Vegas to Kelso after it was learned a man could not be gotten from Los Angeles. When the train reached Lyons, a point between Kelso and Las Vegas, it was derailed and turned over, damaging the equipment and blocking the main line, injuring 14 passengers. The operator, who was on this train No. 1, was instructed by the chief dispatcher to establish a telegraph office at the wreck, in order that he could communicate with headquarters and report conditions and progress there, and enable the dispatcher to move the trains around the wreck when the line was clear. In establishing an office on the line at a wreck, this is a practice we follow on all occasions, as it enables us to clear the line much more quickly. This operator established an office at the wreck and remained until relieved on the evening of January 19th; the chief dispatcher at Las Vegas having employed a man to relieve him and sent him out on No. 1 to the wreck. The operator who had been working at the wreck boarded the same train on which the relief man arrived and went to Kelso. In view of the shortage of help, I would say that a substitute operator was sent to Kelso as expeditiously as could have been done to take the place of Starkey. At that time telegraph operators were extremely scarce. The Western Union and Postal Telegraph companies were using a great many operators, and the men preferred to work in Los Angeles rather than go to the desert points, such as Kelso and Otis. They are both in the desert. At that time we had difficulty in getting operators to go there."

Starkey's illness certainly caused a sudden and unexpected occasion for action on the part of the railway company—a pressing necessity, an emergency, that fairly came within the meaning of the statute. An emergency existing, the defendant company by the first proviso to section 2 of the act was expressly authorized to permit Grandee and Dugan each to remain on duty for 4 additional hours in the 24-hour period on not exceeding 3 days in any week. The case shows that each of them remained on duty for 3 additional hours in a 24-hour period during the 16th, 17th, and 18th days of January. Then, the overtime permitted them during that week by the proviso of section 2 of the act of Congress above quoted ended, and if there were nothing more to the case we would have no difficulty in affirming the action of the court below in directing a verdict for the plaintiff upon the first three counts in case 106, for the evidence is that Grandee and Dugan continued to work overtime during the 20th and for part of the 21st of January. But the uncontradicted proof shows that the defendant company on the 17th of January started an operator—one Ham—to Kelso from Las Vegas, to take the place of Starkey, in ample time to have done so before the expiration of the 3-day period during which Grandee and Dugan were each authorized by the statute to work 4 additional hours in each 24-hour period. But unfortunately the train on which Ham was proceeding was derailed at a point between Las Vegas and Kelso, turned over, injuring 14 passengers, damaging the equipment of the train, and blocking the main line. Because of that disaster Ham was instructed by the chief dis-

patcher of the road to establish a telegraph office at the wreck, in order that he could communicate with headquarters and report conditions and progress there, and enable the dispatcher to move the trains around the wreck when the line was cleared, which he did, resulting in the necessary continuance of overtime work by Grandee and Dugan during the 20th and 21st of January. And the question is whether that accident or casualty rendered the act in question inapplicable. We are of the opinion that it clearly did. See United States v. Missouri Pac. Ry. Co., 213 Fed. 169, 175, 176, 130 C. C. A. 5.

For the reasons stated, the judgment of the court below, in so far as counts 1, 2, and 3 of the complaint in case 106 are concerned, must be reversed.

In the case numbered in the court below 243 it is strenuously insisted by counsel for the plaintiff in error that the court erred in directing the jury to return a verdict for the plaintiff upon counts 3, 4, 5, 6, 7, and 8 of the complaint in that case.

[2] The third count of that complaint alleges a violation of the act of Congress, in that the defendant company on October 3, 1912, on its line between Las Vegas, Nev., and Los Angeles, Cal., required and permitted its conductor, Brown, to be and remain on duty as such in connection with its train No. 1, drawn by locomotive No. 3434, engaged in interstate commerce, for a period in excess of 16 consecutive hours; and its fourth and fifth counts are identical with the third, except that in the fourth Brakeman Edwards and in the fifth Brakeman Berringer are included.

The evidence showed without conflict that train No. 1, which was a passenger train, arrived at Las Vegas, which was a terminal station, October 3, 1912, between the hours of 5 and 5:32 p. m. There the train crew was changed; the outgoing crew, consisting of Brown, Edwards, and Berringer, leaving Las Vegas in charge of the train at 5:45 p. m. of that day, and so remained in charge of its movement until it reached Los Angeles, the place of its destination, at 8 p. m. of the succeeding day, so that, including the preparatory period of 42 minutes, that crew remained in service 27 continuous hours. The schedule running time of that train between the points named was 13½ hours. The train left Las Vegas on schedule time, but subsequently a heavy landslide occurred on the defendant company's line between its stations Otis and Crucero, due to heavy rains, which slide was of such character and magnitude as to stop traffic over the road and compel the detour of train No. 1 over the lines, respectively, of the Tonopah & Tidewater and the Santa Fé Companies—over that of the former from Crucero, the junction of the lines of the defendant company and the Tonopah & Tidewater Company, to Ludlow, the junction of the last-named company and the Santa Fé Company, and over the latter from Ludlow to Daggett. The rails of the Tonopah Company being light necessarily required slow running, especially in view of the condition of the ground, occasioned by the heavy rains, all of which resulted in many delays, which were beyond the power of the defendant company to prevent, and none of which could have been foreseen by the defendant company at the time the train left Las Vegas, nor could the necessity of such detour have been then fore-

seen. When the train reached Daggett, the prescribed 16-hour period had expired—17 hours and 5 minutes having been expended in making that run. At Daggett the engine crew of train No. 1 was relieved, but not its conductor nor brakemen; they having continued on to the destination of the train at Los Angeles. San Bernardino, situated between Daggett and Los Angeles, and 60 miles east of the latter city, is a passenger terminal, but not for through trains. Two local passenger train crews lay over there every night, each having one brakeman only. From the evidence it cannot be doubted that the train crew of train No. 1 could have been relieved both at San Bernardino and at Daggett, and the real question in regard to that crew is whether the act of Congress under consideration required the defendant company to do so.

To such an enactment these observations of the Supreme Court in the case of United States v. Dickson, 15 Pet. 141, 163 (10 L. Ed. 689), are very pertinent:

"The general rule of law, which has * * * prevailed, and become consecrated almost as a maxim in the interpretation of statutes, [is] that where the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that proviso is construed strictly, and takes no case out of the enacting clause which does not fall fairly within its terms. In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exception must establish it as being within the words as well as within the reason thereof."

To hold that the act under consideration is made inapplicable by any and every delay that is the result of a cause not known to the carrier, or its officer or agent in charge of such employé, at the time the latter leaves a terminal, and which could not have been foreseen, would be nothing short of making it a dead letter. Manifestly the whole act must be taken together, and be so construed as to give effect to its humane purpose, and at the same time to give the railroad companies the benefit of the exceptions and provisos in all cases fairly brought within their terms and true intent. There can be no doubt that the paramount purpose of the act was to prevent the overworking of the employés, to the end that their efficiency be not impaired, and that the obligation was thereby imposed upon the carriers to comply with that requirement, unless prevented therefrom because of a valid excuse, secured to them by the provisos and exceptions contained in the act, which was not made effective within the usual time, but its going into effect postponed for one year—the purpose being, as said by the Supreme Court in the case of Northern Pacific Railway Co. v. Washington, 222 U. S. 370, 379, 32 Sup. Ct. 160, 162 (56 L. Ed. 237), "to enable the necessary adjustments to be made by the railroads to meet the new conditions created by the act."

[3] It would seem to follow necessarily that in order for the carrier to justify the excess of service beyond the fixed period prescribed by the act, it must show that the same was not in any respect occasioned by the lack of that high degree of care and foresight properly required of the carrier, but was the direct result of an act of God, a casualty, unavoidable accident, or of delay that was the result of a cause not known to the carrier or its officer or agent in charge of

such employé, at the time the latter left a terminal, and which could not have been foreseen. In the very recent case of Great Northern Railway Co. v. United States, 218 Fed. 302, 134 C. C. A. 98, decided October 28, 1914, by the Circuit Court of Appeals of the Eighth Circuit, that court expressly held, among other things, that the proviso in section 3 of the act under consideration—

"does not relieve the officials in charge of train crews from exercising proper diligence to avoid working them overtime, and proper diligence requires train officials to know whether or not engines and cars are in proper condition for use when starting them upon a run."

In the preceding case of United States v. Kansas City Southern Ry. Co., 202 Fed. 828, 833, 121 C. C. A. 136, 141, the same court, having under consideration the act of March 4, 1907, said:

"By the terms of the proviso the carrier is excused 'where the delay is the result of a cause not known * * * at the time said employé left a. terminal, and which could not have been foreseen.' Not merely which was not foreseen, but which *could not have been* foreseen. The phrase 'by the exercise of due diligence and foresight' is not present. Counsel argue that by leaving out this phrase Congress intended to limit the liability of the carrier; that it meant to imply that what was not actually foreknown could not, in contemplation of this law, have been foreseen. We cannot assent to this interpretation. Clearly Congress did not intend to relieve the carrier from responsibility in guarding against delays in a matter deemed to be of such importance. By this act it sought to prevent railroad employés from working consecutively longer than the period prescribed, as completely and effectively as could be accomplished by legislation. To bring itself within the exceptions stated, the carrier must be held to as high a degree of diligence and foresight as may be consistent with the object aimed at and the practical operation of its railroad. Conformably to this view it has been uniformly held by the courts that, ordinarily, delays in starting trains by reason of the fact that another train is late; from sidetracking to give superior trains the right of way, if the meeting of such trains could have been anticipated at the time of leaving the starting point; from getting out of steam or cleaning fires; from defects in equipment; from switching; from time taken for meals; and, in short, from all the usual causes incidental to operation—are not, standing alone, valid excuses within the meaning of this proviso. The carrier must go still farther, and show that such delays could not have been foreseen and prevented by exercise of the high degree of diligence demanded."

Such was the view of this court in the case of United States v. Northern Pacific Railway Co., 215 Fed. 64, 131 C. C. A. 372, where the accident under consideration was the sole cause why the crew there in question was engaged on its run for more than 16 hours without a rest of 8 consecutive hours.

In the somewhat analogous case of Newport News & M. Val. Co. v. United States, 61 Fed. 488, 490, 9 C. C. A. 579, 580, involving the act of Congress forbidding interstate carriers of animals from confining them for more than 28 consecutive hours without unloading them for rest, water, and food, unless prevented "by storm or other accidental causes," the Circuit Court of Appeals of the Sixth Circuit, speaking through Judge Lurton, said:

"Congress did not mean that, simply because the carrier had encountered a storm, therefore he should be excused. It must appear that the storm 'prevented' obedience. The storm could not be prevented. Its consequences may be avoided or mitigated by the exercise of diligence. If, with all reasonable exertion, a carrier is unable, by reason of a storm, to comply with the law,

then he has been unavoidably 'prevented' from obeying the law. If, notwithstanding the storm, he could by due care have complied with the law, then he is at fault, because 'his own negligence is the last link in the chain of cause and effect, and in law the proximate cause' of the failure to comply with the law. Therefore, to avail himself of the excuse of 'storm,' the carrier must show, not only the fact of a storm, but that with due care he was 'prevented,' as an unavoidable result of the storm, from complying with the law. We can reach but one conclusion as to the meaning of Congress by the expression 'other accidental causes.' If the storm is no excuse, unless its unavoidable effect was to prevent compliance, then it follows that no other accidental cause would be an excuse, unless that cause and its effect are likewise unavoidable. The meaning of the general words, 'other accidental causes,' must be ascertained by referring to the preceding special words. The rule 'noscitur a sociis' is clearly applicable. A storm is unavoidable, in the sense that it cannot be prevented. 'Other accidental causes' must be taken to mean other unavoidable accidental causes. An effect attributable to the negligence of the appellant is not an unavoidable cause. The negligence of the carrier was the cause; the unlawful confinement and unreasonable detention, but an effect of that negligence. What is an inevitable or unavoidable accident has been very thoroughly considered by this court in the case of Weeks v. Transit Co., 61 Fed. 120, 9 C. C. A. 393. It was there said that an inevitable accident 'was an occurrence which could not be avoided by that degree of prudence, foresight, care, and caution which the law requires of every one under the circumstances of the particular case.' Again, we said: 'An accident is said to be inevitable when it is not occasioned in any degree, either remotely or directly, by the want of such care and skill as the law holds every man bound to exercise.' These definitions apply to an unavoidable accident, which is, in the sense of the law, an inevitable occurrence, as defined in that case, and those cited therein. If the accident was one which might have been avoided by due care, then the carrier must be taken to have contemplated the reasonable consequences of his own negligence."

As under the evidence there can be no doubt that the landslide was the direct and necessary cause of the detour of the train in question and of its numerous delays, and that therefore the defendant company was entirely justified in continuing in service its train crew up to the time it could, with the exercise of proper diligence have relieved it, it is plain that the action of the court below in directing a verdict for the plaintiff on counts 3, 4, and 5 must have been based on the view that the defendant company had the opportunity to relieve that crew either at San Bernardino, or Daggett, or both, and was by the statute, properly construed, required to avail itself of it, in which view we think, for the reasons already stated, the court was right—being unable to agree with the learned counsel for the defendant company that by the adoption of the first proviso to the third section of the act "it was the intention of Congress to permit a crew starting from a terminal to remain with the train overtaken by delay, casualty, or unavoidable accident, until the end of the *run*."

In support of that contention counsel earnestly rely upon ruling 88 of the Interstate Commerce Commission, made May 25, 1908, which, after quoting the first proviso of section 3 of the act, reads:

"Any employé so delayed may thereafter continue on duty to the terminal or end of that run. The proviso quoted removes the application of the law to that trip."

That ruling must be read and considered in connection with the preceding ruling of the Commission, made March 16, 1908, which reads as follows:

"287 (i). Sec. 3. The instances in which the act will not apply include only such occurrences as could not be guarded against, those which involved no neglect or lack of precaution on the part of the carrier, its agents, or officers; and they serve to waive the application of the law to employés on trains only until such employés, so delayed, reach a terminal or relay point"

—and must also be read and considered in connection with the action of the Commission, shown by the record in this case, that the suit was directed to be brought by the Attorney General at the request of the Interstate Commerce Commission. But, over and above that, it is the obvious duty of the court to give effect to what it conceives to be the true construction of the act of Congress.

What has been above said in respect to counts 3, 4, and 5 of the complaint in case No. 243 in the court below equally governs the proper disposition of counts 6, 7, and 8 of the same complaint.

The result is that the judgment of the court below, in so far as concerns counts 1, 2, and 3 of case No. 106 in the court below, must be and hereby is reversed, and the cause remanded for a new trial thereon; and as to the judgment of the court below in respect to case No. 243 of that court, its judgment must be and is affirmed.