### UNITED STATES v. MISSOURI PAC. R. CO.

(District Court, D. Colorado. June 19, 1916.)

No. 6431.

1. MASTER AND SERVANT ⬬13—HOURS OF SERVICE—DEFENSES—"CASUALTY AND UNAVOIDABLE ACCIDENT"—"EMERGENCY."

Under Hours of Service Act March 4. 1907, c. 2939, 34 Stat. 1415 (Comp. St. 1913, §§ 8677–8680), declaring, save in the case of casualty or unavoidable accident, or the act of God, that no telegraph operator or train dispatcher shall be required or permitted to be, or remain, on duty for longer

---

⬬For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

than 13 hours in towers, offices, and stations operated only during the daytime, except in case of emergency, when such employés may be permitted to be and remain on duty for 4 additional hours in any 24-hour period not exceeding three days, it is no defense that a telegraph operator remained on duty longer than allowed, in order to prevent cars loaded with live stock, which he had neglected to direct another train to take out, from being delayed; for, while there is a distinction between "casualty and unavoidable accident" and "emergency," the former being associated with the superhuman, the ordinary mishaps of railroad operation of a comparatively trivial nature do not constitute an emergency.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.

For other definitions, see Words and Phrases, First and Second Series, Emergency.]

2. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—DEFENSES.
    That a telegraph operator remained on duty longer than allowed by the act to facilitate the operation of a valuable silk train is no defense; there being no emergency.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

3. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—DEFENSES.
    Where the draw bar of the tender of a train pulled loose and the telegraph operator remained on service for a period longer than allowed by the act until the train reached his station, there was no emergency, and the railroad company is liable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

4. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—DEFENSES.
    Where a train was delayed on account of broken packing rings in one of the cylinders of the locomotive, and a telegraph operator was kept on duty beyond the time allowed by the Hours of Service Act until the train reached his station, there was no emergency warranting a violation of the act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

5. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—DEFENSES.
    That a telegraph operator was kept on duty until a delayed passenger train, carrying mail, reached his station is no defense of a violation of the act, though he was held on duty to care for the mail and passengers.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

6. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—DEFENSES.
    Where, because of the failure of an air pump on the engine, a passenger train was delayed and the telegraph operator was held on duty beyond the time allowed by the act, there was no emergency warranting a violation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

7. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—DEFENSES.
    Where the failure of a telegraph operator to order coal chutes filled delayed a train, and he thus remained on duty beyond the time allowed by the act, there was no emergency warranting a violation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

8. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—DEFENSES.
    Though a train was delayed by the loss of the relief valve of the superheater on the engine, and also by heavy wind, snow, and cold weather and a badly clinkered fire, a telegraph operator should not, for

that reason, be required to remain on duty beyond the time fixed in the act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

9. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—DEFENSES.

That a train was delayed through the bad working of steam heating connections, the thawing out of such connection, and of the ash pan, and because of another delayed train, coupled with adverse weather conditions, does not warrant the keeping of a telegraph operator on duty for a period beyond that authorized by the act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

10. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—DEFENSES.

Where, because of a wreck, a train was delayed and a telegraph operator was kept on duty beyond the time allowed by the act, there was an emergency which justified the violation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

11. MASTER AND SERVANT ☞17—HOURS OF SERVICE ACT—VIOLATION.

In an action for violations of the act, where it was claimed that intermissions broke the continuance of service, but the intermissions were short, and the evidence varied as to when they were taken, it is a question of fact whether they were not mere subterfuges, resorted to to evade the act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. ☞17.]

12. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—VIOLATION.

In an action for the penalty prescribed by the act, the 24-hour period of the act begins when the employé begins duty, and the government cannot, for the purpose of showing a violation, select as the beginning of the period any time while the employé is at work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.]

Action by the United States of America against the Missouri Pacific Railroad Company, to recover the penalty imposed by the Hours of Service Act of March 4, 1907. On demurrer to special pleas of defendant. Overruled as to certain of the pleas and sustained as to others.

Harry B. Tedrow, Dist. Atty., and Jno. A. Gordon, Asst. U. S. Dist. Atty., both of Denver, Colo..

Devine & Preston, of Pueblo, Colo., for defendant.

LEWIS, District Judge. This action is brought to recover the penalty imposed by act of March 4, 1907 (34 Stat. 1415). The complaint contains 12 counts, each of which charges a violation of the act in that the defendant required and permitted its telegraph operator and employee, whose duty it was to transmit, receive, and deliver orders pertaining to and affecting the movements of trains engaged in interstate commerce, to remain on duty overtime—some charging that the particular office at which the operator was employed was a station operated only during the daytime, while others charge that it was one continuously operated night and day, and in each instance that the maximum of hours respectively limited by the act were exceeded. The

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

overtime stated in each count did not exceed four hours, which is permitted by the act in an emergency.

There was a demurrer to the complaint which was overruled. The defendant has answered, and in addition to a general denial, has set up special pleas to all of the counts except the fourth and ninth, to all of which the district attorney has demurred, and this raises the questions for present consideration.

## I.

[1] 1. The first count charges a violation in retaining the operator on duty at the defendant's office and station at Arlington, operated only during the daytime, for a longer period than 13 hours on August 22, 1914, to wit, from 8 a. m. to 11:10 p. m., a total of 15 hours and 10 minutes within the 24-hour period beginning at 8 a. m.

The defendant in its special plea to this count sets up what it claims constitutes an emergency under the second section of the act, by reason of which it asserts it had the right, under the act, to retain the employee for an additional 4 hours. The emergency, as alleged, consisted in the fact that three carloads of live stock were delivered to defendant at Arlington that morning for transportation to Denver. Defendant's dispatcher intended to have the three cars taken into a train passing through Arlington about 10 a. m., but he forgot and failed to order the cars picked up by that train, and in order to avoid holding the live stock until the following day, the dispatcher ordered another train to pick up the cars of live stock, and in consequence the operator could not leave his duties until that train had taken the cars out, which was about 11:10 p. m. on said day.

The demurrer attacks the sufficiency of these facts to constitute an emergency within the meaning of the act. The defendant's counsel points out that the conditions which constitute an emergency within the meaning of the act are necessarily of far less import and seriousness to the railroad than "any case of casualty or unavoidable accident" named in the third section of the act, which latter would entirely exempt defendant from the act and relieve it from the penalty. And thus proceeding with the two provisos in hand, one emergency and the other casualty or unavoidable accident, and matching one against the other, coupled with the definitions that he chooses to apply, he easily reaches the conclusion that it does not require much to constitute an emergency. The comparison is apt and logical. The two conditions are separate and in practice are intended to be kept sharply distinct. They can not be made to overlap. Still they are not necessarily so wide apart. The words of exemption quoted above from the third section are coupled with the superhuman, and perforce imply unexpected and unforeseen disaster. There is obviously a wide field between such extraordinary events which wholly relieve from the rule of law, and mischances and mishaps of a comparatively trivial nature which constantly arise and are dealt with in every line of action. I conceive the field to be one in which the emergencies provided for in the act may occur—such as the unanticipated loss of a train dispatcher (United States v. So. Pac. Co., 209 Fed. 562, 126 C. C. A. 384; United States v. D. & R. G. Co., 220 Fed. 293, 136 C. C. A.

275), or the necessary and unexpected movement of a train carrying troops or large bodies of laborers pressingly needed. Other conditions of equal or similar import might be studied out. Many will in time come, to pass. With the context and purpose of the act in mind, it is unreasonable to believe that the ordinary and everyday ups and downs of railroad operation should be considered emergencies. Such a conclusion would bring within its scope a vast multitude of unexpected and unanticipated minor predicaments and contingencies constantly arising. The term emergency as here used is of greater moment than this,. though of less significance than the terms used in the third section. The same word may be applied with appropriateness in innumerable instances in a variety of different bearings and relations. So we can not stop with its abstract meaning. The context determines its particular significance. A definition that would override and defeat the plain purpose of the act must be rejected. It is believed that the facts pleaded do not show such an unusual and extraordinary condition in railroad operation as to constitute an emergency within the meaning of the act. United States v. B. & O. R. Co. (D. C.) 226 Fed. 220, 223; United States v. C. & N. W. Ry. Co. (D. C.) 219 Fed. 342; United States v. K. C. S. Ry. Co., 202 Fed. 828, 121 C. C. A. 136; United States v. D. & R. G. Ry. Co., 233 Fed. 62, —— C. C. A. —— (recent unpublished opinion Eighth Circuit).

[2] 2. The special plea to the second cause of action admits that the operator was employed at a day and night station, and that he was detained in service more than nine hours, but it sets up as an emergency the fact that there was a trainload of silk delivered.to the defendant by a connecting carrier at Pueblo; that the time of delivery at the connecting point had been erroneously reported to the defendant's dispatcher; that the transportation of silk is very profitable to the carrier; that it is of great value, is an easy subject of theft and can not be permitted to stand on sidings; and that these facts brought about a contingency which required the holding of the operator over the permitted time.

[3] The special plea to the third count setting up a claimed emergency is based on the fact that a train pulled loose from the tender a drawbar which delayed it in reaching the station where the operator was engaged, and it is claimed that that rendered it necessary to hold the operator overtime until the train had reached his station.

[4] The special plea to the sixth count alleges that the emergency consisted in the fact that a train was delayed on account of broken packing rings in one of the cylinders of the engine which was hauling the train, which in turn required the holding of the operator at the particular station named in that count until the delayed train reached his station.

[5] The special plea to the seventh count sets up as a claimed emergency facts showing that a passenger train carrying mail was delayed in reaching the station at which the operator was held overtime on account of various and sundry reasons at different stations en route, and that the operator was held until it arrived to handle mail and care for passengers.

[6] The special plea to the eighth count sets up facts showing another delayed passenger train assigned as an emergency for holding the operator overtime. The delay was caused by the failure of an air pump on the engine hauling the train.

[7] The special plea to the tenth count sets up facts showing the holding of the operator overtime on account of a delayed train due to the fact that the coal chutes at the station in question were nearly out of coal, that the train dispatcher forgot and overlooked his duty in ordering the chutes filled, and that this neglect on the part of the dispatcher brought about the delay which required the holding of the operator overtime.

[8] The special plea to the eleventh count discloses another delayed train as the claimed emergency for holding the operator. The delay was caused by losing the relief valve of the superheater on the engine, and also to heavy wind, snow, and cold weather and badly clinkered fire.

[9] The special plea to the twelfth count discloses another delayed mail and passenger train due to various causes, to wit, bad working of steam heating connections, thawing out steam heating connections, thawing out ash pan, meeting another delayed train, cold, snow, and wind and badly clinkered fire due to weather conditions.

All of these pleas are likewise held to be bad as not stating facts showing in either instance an emergency.

[10] 3. The special plea to the fifth count of the complaint sets up as a claimed emergency for holding the operator overtime a delayed train in reaching his station on account of a wreck which it could not pass until the track had been cleared. This plea is believed to be good as stating facts which entirely relieve the defendant from the penalties denounced in the act. United States v. Missouri Pacific Ry. Co., 213 Fed. 169, 130 C. C. A. 5.

The demurrer of complainant to the special pleas set up in the answer to the first, second, third, sixth, seventh, eighth, tenth, eleventh, and twelfth counts will therefore be sustained, and overruled as to the special plea set up against the fifth count.

## II.

[11, 12] In passing on some of the foregoing special pleas it was said that the defendant in the plea admitted that the operator was held overtime. These admissions, however, were conditional. In some of the pleas it is stated that the hour at which it is charged in the complaint the operator went on duty is not the true hour at which said operator went on duty; that the prosecution has selected a time during the usual hours of service in which the operator worked and counted from the arbitrary hour so selected through the succeeding 24-hour period, instead of beginning with the time at which the operator went on duty each day from which to calculate the 24 hours. The admission is on the complainant's hypothesis, which is said to be false. And so the defendant has put in separate defenses in its answer to the third, fourth, fifth, ninth, tenth, eleventh, and twelfth causes of action, therein claiming that the 24-hour period must in each instance

be calculated from the time at which the operator went on duty each day.

The complainant's demurrer also challenges the sufficiency of these defenses. The attitude of the complainant's counsel in this respect impresses me as an attempt to evade the effect of United States v. A., T. & S. F. Ry. Co., 220 U. S. 37, 31 Sup. Ct. 362, 55 L. Ed. 361. Though this point was not in controversy there, no one appears to have challenged the proposition that the 24-hour period must be counted from the time the operator goes on duty. It was only determined in that case that the hours of service within the statutory limit need not be continuous. To now hold that the prosecution may arbitrarily select any point during the regular hours of service for the purpose of reckoning time of employment appears to me to have the necessary effect in many instances of indirectly evading the rule there announced. For instance, it is permissible under the holding in that case for an operator to enter on his duties every day at 6 a. m. and work to noon, then go on duty again at 3 p. m. and work to 6 p. m., but on every other day instead of beginning at 3 p. m. and working to 6 p. m. he might begin at 4 p. m. and work to 7 p. m. Under the ruling of the Supreme Court there would be no violation of the act. But if the prosecution can arbitrarily select the initial point it can bring the railroad company within the act on every alternate day, thus: Four p. m. to 7 p. m. is 3 hours; 6 a. m. to noon is 6 hours, and 3 p. m. to 4 p. m. is 1 hour, making 10 hours. However, I am not prepared to say that the defenses thus pleaded to the third, fourth, fifth, seventh, eighth, ninth, tenth, eleventh, and twelfth counts constitute good and complete defenses as a matter of law and come within the rule laid down in the case in 220 U. S. 37, 31 Sup. Ct. 362, 55 L. Ed. 361. Indeed, some of them concede overtime employment, and those that do not so show seem to present questions of mixed law and fact. They each start out with the time at which the operator went on duty and the time at which he ceased according to his regular hours, but in each instance there was a short intermission, varying from one hour to two hours in the different defenses, and then his hours extended for a period equal to the intermission. Of course, that renders the situation wholly unlike the facts presented in the case in 220 U. S. 37, 31 Sup. Ct. 362, 55 L. Ed. 361. There the time of employment was not continuous, but it was fixed and regular for each day, and so understood by the operator before he went on duty. The intermissions on each day were of the same hours and at the same time. Where the time is so short, as is stated in these defenses (one to two hours), and is variant as to when the intermission is taken, it becomes a question of fact as to whether or not such intermissions were not mere subterfuges and resorted to for the purpose of evading the act and not really for the purpose of giving the operator time off duty.

But a singular situation presents itself in this respect under the pleadings. That is, assuming that defendant's claim as to when to begin counting time is correct, but that these defenses should be resolved against the defendant on the facts, it is a question of some moment whether that conclusion would establish the particular of-

fenses charged in the different counts of the complaint to which they are directed. The charges in most of the counts, as already said, start from an arbitrary point during the employee's hours of service from which to reckon the 24-hour period, which is a different point from that set up in these defenses. That question, however, need not be determined at this time, for it is not now presented.

The demurrer to these defenses will be overruled.