BALTIMORE & O. R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1917.)

No. 2910.

1. MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—RAILROADS—TELEGRAPH OPERATORS.

Hours of Service Act (Act March 4, 1907, c. 2939) § 2, 34 Stat. 1415 (Comp. St. 1916, § 8678), declares that it shall be unlawful for any common carrier to permit or require any telegraph operator or train dispatcher to remain on duty in towers, offices, or stations operated only during the daytime for longer than 13 hours, except in case of an emergency, when such

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

employés may be permitted to be and remain on duty for 4 additional hours in a 24-hour period, not exceeding 3 days in any week. Section 3 (Comp. St. 1916, § 8679) declares that any such common carrier, permitting or requiring any employé to remain on duty in violation of section 2, shall be liable to a prescribed penalty, but that the provisions of the act shall not apply in any case of casualty, or unavoidable accident, or the act of God. *Held*, that the exception contained in section 3 applies to telegraph operators, regardless of the proviso allowing them to be kept on duty for 17 hours in case of an emergency.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

2. MASTER AND SERVANT ⟨key⟩13—HOURS OF SERVICE ACT—RAILROADS—TELE- GRAPH OPERATORS.

At a station where the only employé was both agent and telegrapher, the pipe leading up from a pump through the bottom of a water tank used for engines sprung a leak, so that it could not be drained. The weather was extremely cold, and the agent, recognizing that, if water was al- lowed to stand in the pipe without any pumping, it would freeze and the system be disabled, communicated to his superiors and was directed to remain on duty during the night, keeping up steam and operating the pump at frequent intervals. It did not appear that it would have been impossible to have relieved the operator within the 17-hour period pre- scribed by Hours of Service Act. § 2. Section 3 of the act, prescribing a penalty for violation of the provisions of section 2, declares that such pro- visions shall not apply in any case of casualty or unavoidable accident. *Held* that, as a casualty or unavoidable accident, to take the case out of the emergency provision referred to in section 2, must be more than some occurrence of a more or less trifling nature, which might possibly be foreseen, it was a violation of the act to retain the agent and telegraph operator on duty for more than 17 hours; it not appearing that the opening of the leak was unavoidable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge.

Action by the United States against the Baltimore & Ohio Railroad Company. There was a judgment for the United States, and defend- ant brings error. Affirmed.

S. H. Tolles and R. C. Hyatt, both of Cleveland, Ohio, for plaintiff in error.

Philip J. Doherty, of Washington, D. C., and E. S. Wertz, U. S. Atty., of Cleveland, Ohio, for the United States.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. In an action for the penalty for violat- ing the Hours of Service Act (34 Stat. p. 1415), the court below di- rected a verdict in favor of the government, and the railroad company, defendant below, brings error.

The controlling facts are not in dispute. At a small station, named Sandyville, Hoover was the sole railroad employé. The station was open only in the daytime, and Hoover was both agent and telegrapher. In addition, it was his duty to operate, at intervals, a steam pumping engine, so as to keep full the water tank used for supplying engines.

Customarily this pump was not used at all during the night. January 13, 1914, was one of the coldest days in the winter. At 5:30 in the afternoon, near the end of his period of service, Hoover found that, because of a defect which had developed in some unknown way, the pipe leading from the pump to the tank could not be drained, and he knew that, if the water was allowed to stand in it without any pumping being done, it would freeze and the water supply system would be disabled. It thereupon became apparent that some one must stay during the night, keep up steam in the boiler, and run the pump for a few minutes at frequent intervals. He wired the division superintendent, and was directed to stay until relieved. He was not relieved until 6:30 a. m., January 14th, making nearly 24 hours of continuous service. It may be assumed that it was impossible to obtain any help or relief from the nearby village of Sandyville, and that after the report reached the superintendent's office there was no regular train, on which relief could have been sent from division headquarters or from any station where employés were available, until the train on which the relief was sent; but at Valley Junction, five miles away, three engines customarily lay overnight, and did so the night of January 13th.

[1] Those sections of the Hours of Service Act which are here involved are sections 2 and 3, and they are quoted in the margin.[1] It is plain that Hoover belonged in the class of telegraph operators, and that the proviso of section 2, considered by itself, was an absolute prohibition of his employment for more than 17 consecutive hours; but it is claimed that the proviso of section 3 contemplates certain instances where the act should not apply at all, and it is said that what happened here was a "casualty or unavoidable accident," and hence that service even for more than 17 hours was not, necessarily, a violation of

[1] Sec. 2. That it shall be unlawful for any common carrier, its officers or agents, subject to this act to require or permit any employé subject to this act to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employé of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty: * * * Provided, that no operator, train dispatcher, or other employé who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine-hours in any twenty-four hour period in all towers, offices, places, and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the day time, except in case of emergency, when the employés named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four hour period on not exceeding three days in any week.

Sec. 3. That any such common carrier, or any officer or agent thereof, requiring or permitting any employé to go, be or remain on duty in violation of the second section hereof, shall be liable to a penalty of not to exceed five hundred dollars for each and every violation: * * * Provided, that the provisions of this act shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employé at the time said employé left a terminal, and which could not have been foreseen: Provided, further, that the provisions of this act shall not apply to the crews of wrecking or relief trains.

the law. In reply, it is urged that telegraphers and those of similar duties, and who are covered by the proviso of section 2, constitute a class by themselves, the burdens and exemptions of which are exhaustively covered by this section 2 proviso, and which class is wholly beyond the scope of the proviso of section 3.

We are constrained to think that the proviso of section 3 may apply to telegraphers as well as to other employés. The interrelation of the two sections compels this conclusion. Section 2 is the only section which undertakes to say what acts shall be prohibited, and section 3, as an independent section, has no office except to provide for the punishment of those who violate section 2. In its opening lines, it expressly refers to section 2, and there is no penalty for the employment of a telegrapher for more than 17 hours, excepting as section 3 prescribes a penalty. So it cannot be thought that, because the proviso is found within the limits of section 3, it does not apply to section 2 with percisely the same force as if it had been appended to section 2.

Further, the language of the proviso is all-embracing. It says "that the provisions of this act shall not apply in any case of casualty. * * *" To hold that in spite of this declaration some of the "provisions of this act" nevertheless did apply in case of casualty, just the same as if this proviso did not exist, it seems to us would be to ignore the plain terms of the law. The "emergency" provision itself, of section 2, is one of the things superseded when the "casualty" happens.

[2] If the "emergency" which will permit 17 hours' service under section 2, and the "casualty or unavoidable accident" required to invoke the proviso of section 3, were the same thing, there would be reason to say that the latter proviso did not cover the cases reached by the former; but there is not only a presumption of a difference in meaning from the fact that the words are selected and put into contrast, but they inherently imply distinction. Congress would naturally have foreseen that, in the course of railroad service, there would be a great number of unexpected conditions which would require the service of a telegrapher for a few extra hours, and which well might be termed emergencies, but which would not at all rise to the scope of an act of God, an unavoidable accident, or a casualty. While "casualty" and "unavoidable accident" are terms broad enough to cover many rather trifling things, yet their association in this section and their contrast with the "emergency" of another section indicate that they were not used in any such broad sense, but only with reference to those extremer cases which justify coupling them up with "act of God." This construction has been adopted by those Circuit Courts of Appeals which have passed on the question. United States v. Mo. Pac. (C. C. A. 8) 213 Fed. 169, 130 C. C. A. 5; San Pedro Ry. v. United States (C. C. A. 9) 220 Fed. 737, 136 C. C. A. 343; Denver Ry. v. United States (C. C. A. 8) 233 Fed. 62, 65, 147 C. C. A. 132.

With this view of the act, we cannot regard the accident which happened here as a thing justifying the exemption given by the proviso of section 3. It rather belonged, and distinctly so, in the class of "emergencies." The record does not disclose the precise nature of the

occurrence, but the pipe leading up from the pump through the bottom of the tank, up through the water and discharging near the top, in some way sprung a leak or broke off in that part which was submerged in the water in the tank, with the result that the pipe could not be drained at the pump without also draining the tank. No one knows why this occurred. It apparently was one of the ordinary defects which continually develop in the operation and use of any mechanical apparatus. It cannot rightly be called a "casualty," under this section, and, though it was an "accident," no one can say it was unavoidable. If this precise occurrence had occurred to the mind of the draftsman of the act, his very natural inference would have been that 4 hours of extra time was enough to allow for such a contingency. For definitions of "emergency," confirming or supporting our interpretation, see United States v. Denver Ry. (C. C. A. 8) 220 Fed. 293, 136 C. C. A. 275; United States v. So. Pac. (C. C. A. 8) 209 Fed. 562, 126 C. C. A. 384; United States v. Mo. Pac. (D. C.) 235 Fed. 944.

A consideration of some further facts shows that this construction does not put upon this railroad any such degree of hardship as to make us hesitate to adopt it. If it was not practicable to instruct Hoover to let the water run, even if it drained the tank, all that was needed was a man with the skill of an ordinary fireman. There were, at this time, three firemen, not on duty, only 5 miles away, and no reason appears why the necessary relief could not have been had from that source with the slight trouble involved in sending an engine 5 miles. If this was not practicable, the city of Canton was only 12 miles away, and, in the absence of proof, it was right to presume that relief could well have been sent from Canton.

The judgment below is affirmed.