## UNITED STATES v. SOUTHERN PAC. CO.

(Circuit Court of Appeals, Ninth Circuit. October 22, 1917.)

### No. 2790.

1. MASTER AND SERVANT ⬤⟿13—HOURS OF SERVICE—CONTINUITY OF SERVICE.

Where members of train crews were released from duty at a division terminal for an hour to an hour and a half, while refrigerator cars were being iced and trains were being switched, made up, and broken up, but the releases were not absolute, and the time limit, if a time limit was specified, was subject to change, and the men were required to hold themselves in readiness to respond to a call, and to be within reach in case their services were needed within the designated period of the release, such release did not break the continuity of the service within the Hours of Service Law, and where there was evidence tending to show that releases were of this character, it was error to refuse to charge that a release, to break the continuity of service, must be such that all the facts and surrounding circumstances would permit of the employés being absolutely free to come and go at will, and not so restricted that the complete enjoyment of the release might be hampered by the fear that the employé might be wanted during the time of the release.

2. MASTER AND SERVANT ⬤⟿13—HOURS OF SERVICE—EXCUSES FOR EXCESSIVE SERVICE.

That rainfalls a few days previous had affected the track, roadbed, and bridges of a railway company, so that trains were subjected to delay, and it could not be told how long a trip would take, did not bring the excessive hours of service of members of train crews within the proviso of Hours of Service Act March 4, 1907, c. 2939, § 3, 34 Stat. 1415 (Comp. St. 1916, § 8679), providing that such act shall not apply in any case of casualty, unavoidable accident, or act of God, nor where the delay was the result of a cause not known to the carrier or its officers or agent in charge of the employés at the time the employés left a terminal, and which could not have been foreseen, where it was known at the time the trains left the terminal that they might be subject to delay, and it was only the duration of the delay that was unknown.

In Error to the District Court of the United States for the Southern Division of the Southern District of California; Oscar A. Trippet, Judge.

Action for statutory penalties by the United States against the Southern Pacific Company. Judgment for defendant, and the United States brings error. Reversed and remanded.

The United States brought an action against the Southern Pacific Company to recover penalties for violation of the federal Hours of Service Law (34 Stat. 1415). The complaint contained 30 counts, involving the hours of service of five train crews, each with six employés. The complaint alleged that the crews were required and permitted to be and remain on duty for periods longer than 16 consecutive hours on trains running between Los Angeles and Indio, in the state of California, and between Palm Springs and Los Angeles, on dates between February 2, 1914, and March 13, 1914. The answer of

the defendant was that the hours of service so alleged in the complaint were interrupted at the station of Colton, Cal., by periods of full and absolute release, during which each employé was not called upon to perform any duty, and was entirely relieved from any duty in connection with his employment. To counts 7 to 12, inclusive, the answer pleaded the additional defense that the operation of the defendant's trains was interfered with by an unprecedented rainfall, which so injured and damaged the defendant's track that it was impossible for the defendant to operate its trains in such manner as to comply with the rules and regulations relative to the 16-hour law, and that said flood was unexpected, and could not in any manner have been guarded against by the defendant. To the ninth count the defendant, by a second amended answer, alleged in further detail the nature and extent of the rainfall which occurred on February 19, 20, 21, and 22, 1914, whereby the defendant's track became soft and uncertain, rendering it impossible for the defendant to know with any degree of certainty the exact time within which any number of miles could be made over said track between given points, or the speed to be traveled by the trains, and any delay which occurred from that cause could not have been foreseen or guarded against by the defendant. To the defenses so pleaded, relating to the flood conditions, the plaintiff demurred, but no action was taken by the court on the demurrer.

The court instructed the jury on the alleged release in substance as follows: That in determining whether or not the men had a reasonable opportunity for rest and recreation during the time they were released from duty the jury should take into consideration all the facts and circumstances connected with such release, whether it was a release in good faith, whether or not the men had, during the period they were released, the right to do as they pleased, whether they were masters of their own time, and whether they really had a substantial and opportune period of rest; that if they found that the release from duty at Colton was a break in the hours of service within the meaning of the law, then they should find for the defendant upon that issue; but if, on the other hand, they should find that the employés were not released in such a manner that they were masters of their own time, and did not have a reasonable and fair opportunity for rest and recreation, they should find for the plaintiff upon that issue. The court denied the following instruction requested by the plaintiff: "A release, to break the continuity of service, must be such that all the facts and surrounding circumstances will permit of the employés being absolutely free to come and go at will, and not so restricted that the complete enjoyment of such release may be hampered by the fear that such employé may be wanted by his employer at some particular place during such time of release for duty in connection with his regular work. It is not sufficient that the carrier state to the employés that they are released and free to go wherever they choose, when the employé at the same time is given to understand that he shall keep himself in readiness to respond whenever called for or needed to resume regular duty." The jury found for the defendant.

Albert Schoonover, U. S. Atty., of Los Angeles, Cal., and Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C.

Henry T. Gage and W. I. Gilbert, both of Los Angeles, Cal., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The plaintiff assigns error to the refusal of the court below to instruct the jury to find for the plaintiff on each of the three groups of cases set forth in the complaint, and to the refusal of the plaintiff's requested instruction.

It was shown that Colton is a division terminal, and that all freight trains were stopped at that station, and train and engine crews were

relieved for the length of time of the necessary detention of trains for icing the refrigerator cars, and switching, making up, and breaking up of trains. This work was done by others than the train or engine crews which brought the trains into Colton. It was stipulated between the parties that as to the first group of counts the employés were given by the defendant at Colton what was designated by said defendant at said time a release of one hour and thirty minutes, and the same stipulation was made as to the second group of counts, except that the release was designated as one hour and twenty minutes, and the same stipulation was given as to the third group of counts, except that the release was designated by the defendant as one hour. Several of the employés testified as witnesses in the case, as did also the superintendent of the Los Angeles division and the assistant superintendent of the Southern Pacific at Los Angeles. The testimony of the employés is to the general effect that the employés, after receiving the release at Colton, were at liberty to do what they pleased, but were to return to their duty at a time approximately given by the yardmaster, that they had a right to go anywhere within reasonable limits, but not too far away from the yard, where they could be found in case of necessity, and that they were at all times supposed to be within calling distance; the time limit being subject to change. Gibson, a conductor, testified that:

"When the yardmaster gave us our release, he usually says, 'You are released for two hours,' or more, whichever it might be, whichever was the case. * * * It is a verbal release. I do not remember the form of the expression used on this particular day."

He further testified that:

When given a release for a definite time, "I had a right to go anywhere I wanted to in that time within the limits; that is, within reasonable limits. What I mean by that is, not to go too far away from the yard, but where they could find me in case of necessity. * * * My instructions were that I was released for a certain period of time, and that I had absolutely nothing to do during that time. * * * We were at all times supposed to be within calling distance, and for that reason during these releases I would stay within calling limits, which, I believe, is one mile."

Richardson, an engineer on the same train, testified:

"From the time we reach the station at Colton, and turn the train over to the yard crew, we had no duties to perform in relation to it. * * * We are at liberty, if we see fit, to go and play a game of ball, and we are to return to our duties at a time approximately to be given us by the yardmaster."

Lindley, a freight conductor, testified that:

On arriving at Colton the trainmaster, "if he sees there is quite a bit of delay, says, 'You are released until called to finish the trip.' I was released there this day for an hour and thirty minutes."

Winters, a train engineer, testified:

"I was relieved for an hour and thirty minutes at Colton, but I don't remember the terms of that release. It meant that we were to be released; the watchman would take charge of the engine, and we were to get off and stay away from the engine until the time was up, unless they called me. * * * We had to be accessible at the expiration of the hour and thirty minutes, but we had a right to be any place so far as I could see."

Whalen, the superintendent of that division of the defendant's road, testified:

"The purpose of that release was to give them a rest. We did not need them there while we were doing the work. If we had not released them, the hours of service would have continued. If they had not been released under the form that they were released, they probably would not have reached their destination within the 16 hours. When the release was given, it was not given with the anticipation necessarily that the crew might not reach their destination within 16 hours. We did not need them; so we gave them their freedom. * * * All of these employés were paid for the time that they were released at Colton. * * * When they are released, they can do anything they see fit. When released, they would probably say: 'You will find me at such and such a place. I will be down at the bunkhouse, or at the hotel, or getting lunch.' * * * When these men were released, they did not know when they would be called again. They might not be called for two hours, or they might be called within an hour. The form is, 'You are released.' That means that he is released from responsibility until called. * * * When these men were released for an hour and thirty minutes, in these particular cases, that meant that they were released, that they were as free men as there is in the world until the call boy gets them again."

Sloan, the assistant superintendent of the division, testified that:

The system of release followed at Colton during February and March of 1914 was that the men were released from duty on their arrival until they were called to leave. "Released until called meant that they understood that they were off duty; that they were not in any way employed. They are absolutely free, and they would be called when they were needed, just the same as for their initial trip. The release was for an indefinite period."

[1] It will be seen that there was evidence clearly tending to show that although the employés were relieved from duty for periods of one hour, one hour and twenty minutes, or one hour and thirty minutes, as the case might be, the releases were not absolute; that the time limit of the releases, if a time limit was specified, was subject to change; and that the men were required to hold themselves in readiness and to be within reach in case their services were needed at any time within the designated period of the release. A release of such a nature would not, we think, be sufficient to break the continuity of service. As was said in Missouri, K. & T. Ry. v. United States, 231 U. S. 112, 34 Sup. Ct. 26, 58 L. Ed. 144, men who are thus released nevertheless "stand and wait." In Northern Pac. Ry. Co. v. United States, 220 Fed. 108, 136 C. C. A. 200, the crew were told that they were relieved from duty for one hour and thirty minutes while waiting at a station for other trains to pass. In that case we held that there was lack of freedom from restraint, and of that release from the duty to stand by and wait for orders which prevent the full and free exercise of an opportunity to rest. In United States v. Minneapolis & St. L. R. Co. (D. C.) 236 Fed. 414, Judge Wade said:

"Rest is largely psychological. The circumstances must be such as to induce rest. * * * The public is interested in actual rest, not in opportunities for rest."

In harmony with this view of the statute are United States v. Chicago, M. & P. S. Ry. Co. (D. C.) 197 Fed. 624, United States v. Northern Pac. R. Co. (D. C.) 213 Fed. 539, United States v. Chicago

& N. W. Ry. Co. (D. C.) 219 Fed. 342, and Minneapolis & St. Louis Railroad Co. v. United States, 245 Fed. 60, —— C. C. A. ——. Under the facts as they were disclosed by the evidence, and especially as they were testified to by the defendant's superintendent and assistant superintendent, we think that the plaintiff was entitled to an instruction to the jury substantially as requested, and that to deny such an instruction was reversible error.

[2] It remains to be considered whether or not the special defense pleaded to counts 7 to 12, inclusive, was sufficient to bring the excessive hours of service involved in those counts within the proviso of section 3 of the act. The service referred to in those counts was rendered on February 27, 1914. The evidence was that a heavy rainfall occurred on February 18th, 19th, and 20th, and a slight rainfall on the 21st. Sloan, the assistant superintendent, testified that the rains and resulting floods delayed the trains by washouts, but that on the 26th and 27th the company moved more equipment than usual in handling delayed freight. Referring to conditions on the 27th, he said:

"All trains show a delay and lost time in there. The dispatcher's notes show the time lost on account of soft tracks, slow orders, etc. It was necessary to restrict the speed of all trains to that of safety in that vicinity, and it was many days before we got the track fixed up so that they could make anything like reasonable speed. There was no way by which it could be definitely determined by the dispatcher as to what time could be made on this soft track. That was a matter which was necessarily placed largely in the discretion of the crew in actual operation. When a freight train under those conditions left Los Angeles, the dispatcher couldn't tell whether he could move to Colton in six hours or nine hours. In the first place, the track conditions and the slow trains he had to meet, and his delays waiting for them, and then other delays waiting for him when he got started over this slow trip. It was awfully slow work, and delays trains something terrible. So far as I am concerned, I know of no way of foreseeing this track difficulty. I couldn't tell how much they were going to lose."

Referring to the train in question in counts 7 to 12, inclusive, which left Indio for Los Angeles February 27th, he testified:

"I do not know of anything that occurred subsequent to the departure of that train from Indio that affected its movement, except track conditions, and the condition of the track was known at the time the crew left the terminal, in a general way, but the condition of the track was not such that we could tell the exact running time."

The facts so testified to do not bring the case within any of the exceptions of the proviso. "If affirmative defenses are pleaded, the proof should bring the case clearly within the letter, as well as within the spirit, of the proviso." United States v. Great Northern Ry. Co., 220 Fed. 630, 136 C. C. A. 238. It is not shown, indeed, that any delay of the train in question was caused by the condition of the track. It is clear that the delay, if there was a delay, was not caused by a "casualty," or an "unavoidable accident," or by an "act of God." The heavy rainfall, which is presented as an act of God, had occurred several days before, and the condition of the track, the roadbed, and the bridges was well known on February 27th. The only change then to be expected was a daily improvement of the conditions. It was well known on that day that trains which traveled between Indio and Los

Angeles might be subject to delay on account of the condition of the track and the congestion of travel. If there was a delay, therefore, it was not "the result of a cause not known to the carrier or its officer or agent in charge" at the time when the train "left a terminal." The causes of probable delay were known. It was only the duration of the delay that was unknown. The delay in such a case is similar to that which occurs from a hot box, an extraordinary head wind, or an unusually heavy movement of freight, in all which cases the delay results from a cause which is known, or should be known, to the carrier at the time when the train leaves the terminal. Great Northern Ry. Co. v. United States, 218 Fed. 302, 134 C. C. A. 98, L. R. A. 1915D, 408. In San Pedro, L. A. & S. L. Co. v. United States, 220 Fed. 737, 136 C. C. A. 343, this court said:

"In order for the carrier to justify the excess of service beyond the fixed period prescribed by the act, it must show that the same was not in any respect occasioned by the lack of that high degree of care and foresight properly required of the carrier, but was the direct result of an act of God, a casualty, unavoidable accident, or of delay that was the result of a cause not known to the carrier, or its officer or agent in charge of such employé, at the time the latter left a terminal, and which could not have been foreseen."

See, also, Northern Pac. Ry. Co. v. United States, 213 Fed. 577, 130 C. C. A. 157; Denver & R. G. R. Co. v. United States, 233 Fed. 63, 147 C. C. A. 132; United States v. Atchison, T. & S. F. Ry. Co. (D. C.) 236 Fed. 154.

The judgment is reversed, and the cause is remanded for a new trial.