**HEGGLUND v. UNITED STATES.**
No. 8684.

Circuit Court of Appeals, Fifth Circuit.
Nov. 22, 1938.

HUTCHESON, Circuit Judge, dissenting.

———◆———

Sam H. Jones, Charles A. McCoy, and Alvin O. King, all of Lake Charles, La., Joiner Cartwright, of Beaumont, Tex., and M. A. Grace, Edwin H. Grace, and Daniel H. Grace, all of New Orleans, La., for appellant.

Harvey G. Fields, U. S. Atty., and J. Fair Hardin, Asst. U. S. Atty., both of Shreveport, La.

Walace Hawkins, of Dallas, Tex., and Samuel C. Lipscomb and A. D. Lipscomb, both of Beaumont, Tex., amici curiæ on behalf of appellant.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

A rehearing was granted in this case at the last term. Upon a reconsideration, it is ordered that the opinion previously filed be withdrawn, but that the judgment of affirmance stand with a restatement of our reasons which follows:

Hegglund as master of the motor tankship Bidwell, owned by Sun Oil Company, was convicted for discharging oil, and suffering and permitting it to be discharged, from his ship into Calcasieu River in Louisiana, being coastal waters of the United States, on April 16, 1937, contrary to the Oil Pollution Act of June 7, 1924, 33 U.S.C.A. § 431 et seq. He was sentenced to pay the minimum fine. On this appeal his main contentions are that the Act prohibits only intentional discharges of oil, and that the evidence does not show that he was even negligent, but that the oil escaped by an unavoidable accident to the ship, a thing expressly excepted by the Act.

There are older laws to protect the harbors and coastal waters from pollution, but they deal with refuse less motile than oil. The Act of 1924 deals expressly and wholly with oil carried in quantity as fuel or cargo, a substance most likely to escape of its own movement and cause a fire hazard by spreading over the waters, or to befoul the beaches, or to injure seafood, or destroy marine life. The prevention of these things is indicated by the Act itself as its object. Oil upon the waters is as harmful if its presence be due to inattention as if due to design. The language of the Act is broad enough to protect against both cases. The words: "It shall be unlawful for any person to discharge * * * oil * * * into or upon the coastal navigable waters of the United States from any vessel using oil as fuel * * * or * * * carrying or having oil thereon in excess of that necessary for its lubricating requirements", would easily and naturally refer to voluntary acts of discharge, and might be restricted to such. But the words are added: "or suffer, or permit the discharge of oil by any method, means, or manner". Remembering the

tendency of oil to discharge itself at every opportunity, these sweeping words seem intended to require vigilance and foresight to prevent it. An escape of oil which could have been foreseen and prevented is a discharge suffered or permitted within the intent of the Act. This construction seems the more reasonable when we note the words of exception: "Except in case of emergency imperiling life or property, or unavoidable accident, collision, or stranding, and except as otherwise permitted by regulations." Section 3, 33 U.S.C.A. § 433. The exceptions of emergency and regulations, and perhaps stranding, seem to contemplate voluntary discharges of oil, but unavoidable accident and collision apply peculiarly to unintended discharges of oil. The latter show that unintended discharges are in general prohibited, but are to be excused in case of unavoidable accident or collision.

■ In the present case the oil leaked out of the Bidwell as she was loading it, through leaks under the waterline. The Bidwell had thus leaked two or three times shortly before. Each time she had been dry-docked, the leaks located and repaired. The prosecution contends that she was known to the master to be a leaky vessel, and that he wilfully loaded her, taking the chance of her leaking again. The master contends that all riveted tankers are liable to leak through the strains put on the hull in discharging the water ballast and pumping in the oil, and that in this instance the escape of oil was unintentional and due to unavoidable accident. We hold that if the Bidwell was a tight ship, duly inspected, and loaded without any previous reason to expect that oil would be discharged from her but that it did leak out unavoidably from some accidental or unknown cause, there would be a discharge through unavoidable accident. But if she was known to be likely to leak when loaded, the master could not claim an unavoidable accident when she did thus leak. While there was evidence to sustain the master's contention, there was also sufficient evidence to justify a contrary finding. Some of the witnesses, indeed, say that all riveted tankers sometimes leak, and the leaking is unavoidable, but this is contradicted by the experience of the Sun Oil Company, which has seventeen riveted tankers in service. Fifteen of them have not leaked. One has leaked once. The seventeenth, the Bidwell, now seventeen years old, has been reported as leaking and had been repaired either twice or thrice just previously to the occasion prosecuted for. Error is assigned on the admission of this evidence, but the evidence is clearly relevant and weighty. She was certainly leaking on both sides on the day in question. It is testified that the master remarked that she had been leaking during the five years he had commanded her. The Government witnesses say that riveted tankers do not generally leak. The Bidwell could be found to be a leaky ship, known as such to the master.

■ We do not think the oil discharged was negligible. Some witnesses say it was not much, and was escaping slowly as the Bidwell loaded throughout the night. One witness, however, testified that he followed in his boat the trail of oil three miles up the river, and it led to the Bidwell. Another says the oil was one-eighth of an inch thick on the water around her. But the amount of oil discharged is not the test of guilt. No regulations having been made on the point, any amount which can be avoided is prohibited. The amount here was not very great, and the minimum fine imposed indicates that the judge did not think this an aggravated case.

■ An attack is made upon the constitutionality of the provision of Section 5 of the Act, 33 U.S.C.A. § 435, for the revoking by the Board of Local Inspectors of the license of a master who is found violating the Act. No such revocation has been attempted here, and the question does not arise.

Judgment affirmed.

HUTCHESON, Circuit Judge (dissenting).

I think the judgment appealed from should be reversed. These are my reasons:

(1) I think that only by a strained and unnatural construction can the word "discharge", the statute uses, be extended to cover and prohibit small and involuntary escapes of oil forced, as here, through rivets by an abnormal or unusual pressure or strain while loading.

(2) If such a meaning can or ought to be given to the word, in a proceeding against a "person" responsible for the condition which permitted such escape, it cannot be reasonably said that the master of the vessel was "the person" who "dis-

charged, suffered or permitted the discharge of oil" by the leakage occurring here. The person responsible for that escape, if it was under the statute a prohibited discharge, was the operator of the vessel, the Sun Oil Company, or perhaps the superintendent, or person in charge of keeping the ship in condition.

In short, I believe we have fallen into the error first, of treating, as a discharge of oil prohibited by the statute, what was in fact, no discharge at all, but a small, negligible leakage; and further, if the leakage occurring here was a discharge under the statute, we have erred in holding that the Master was "a person who discharged it, or suffered or permitted its discharge."

A reading of the analogous sections, 407, 441 and 444, of Title 33, and the authorities construing them, strengthens me in the view that what Congress was prohibiting was downright, positive acts of omission or commission, which themselves directly caused, or created conditions which caused, the discharge in substantial quantities, of oil or other refuse, when such acts were under the control of the persons charged with the offense.

The more carefully Sec. 433, the Section in question, is read, the clearer in meaning, I think it becomes that it penalizes positive, overt acts of commission or omission within the power of the person proceeded against. The structure of the statute as much as the words it uses, I think, forces this conclusion. It begins: "Except in case of emergency imperiling life or property or unavoidable accident, collision or stranding, and except as otherwise permitted by regulations prescribed by the Secretary * * * it shall be unlawful for any person to discharge, or suffer, or permit the discharge of oil."

The first exceptions certainly have to do with dynamic, active situations, as the result of which it may be necessary or expedient to, or impossible to prevent, the discharge of oil. These four active situations are (1) emergency, imperiling life or property; (2) unavoidable accident; (3) collision; (4) stranding.

In the opinion as first written by me and now withdrawn, I rejected, as without any reasonable basis, the view that "unavoidable accident" is used in the statute in the sense of occurring, though due care is exercised. I still reject that view. "Unavoidable accident," as the statute uses it, is something happening akin to, but not exactly the same as, the other three exceptions, emergency, collision or stranding. It describes a situation brought about without fault, in or as the result of which, it becomes necessary to intentionally discharge or permit the discharge of oil.

When you come to the second exception, "and except as otherwise permitted by regulations prescribed by the Secretary" it is perfectly plain that this refers to intentional positive acts. The thing done, being expressly prescribed by the Secretary, must be something positive or intentional.

I think, therefore, that we should say that rivet leaks of this kind, so small as to be practically negligible, are not "discharges", because they are not intentional, or reasonably preventable, either in the act of discharging, or in the creation of the condition which permits the escape of oil.

This does not mean that the statute does not cover the case of a leaking tanker, which is sent out in a leaking condition known to the owner and the master, for here there would, in my opinion, be a discharge suffered or permitted, since the condition which caused it was existing and known to those who sent, or took, the ship to sea.

It is this situation of a leaky tanker which confused me on the first hearing. I was convinced then, and am convinced now, that the statute extends to leaking tankers which are known to master and operator to be leaking, and which are nevertheless kept and maintained in service. I think the difference between such a case and this is, that here we have no leaky tanker. We have a riveted tanker, which only occasionally, and then in a small way, and under certain pressure conditions, (which sometimes, but by no means always, occur in loading), permits a small and negligible amount of oil to escape.

When I come to the second point, the personal guilt of the Master, I think the case for reversal even stronger. The Master had nothing whatever to do with the leakage. This was the result of conditions arising during the loading, over which he had no control; a leakage so negligible as not to amount to a discharge, and one which, after previous trips, everything had been reasonably done to remedy.

I respectfully dissent.