## THE PAN-AM.

No. 8693.

Circuit Court of Appeals, Third Circuit.

Argued March 6, 1945.

Decided April 25, 1945.

Irving Storch, Dept. Justice, of Washington, D.C. (Francis M. Shea, Asst. Atty. Gen., Thorn Lord, U. S. Atty., of Newark, N. J., J. Frank Staley, Sp. Asst. to the Atty. Gen., and Vincent E. Hull, Asst. U. S. Atty., of Newark, N. J., on the brief), for appellant.

Messano & Messano, of Jersey City, N. J. (Herbert P. Reid and Renato C. Giallorenzi, both of New York City, on the brief), for appellee.

Before BIGGS, MARIS and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

The United States filed a libel against the Oil Tanker Pan-Am alleging breach of the Oil Pollution Act, Act of June 7, 1924, 33 U.S.C.A. § 431 et seq., in that the vessel had discharged oil into coastal navigable waters of the United States. The ship's answer set up as a defense that after leaving Curacao in the Netherlands West Indies on August 8, 1941, on August 11 the vessel encountered strong northwest[1] winds which strained her; that the master observed that oil had escaped through the vessel's seams; that any seepage of oil into the coastal navigable waters of the United States was unavoidable and the result of an emergency.

The court below found that oil leaked from the Pan-Am into the coastal navigable waters of the United States because of

[1] It will be observed that the answer asserts that the Pan-Am encountered strong "northwest" winds and that the entry by the master in the official log recites "August 11, 1941. Winds N. W. strong * * *". The chief mate's log notes on August 9 a wind east northeast, force 4. The master's entry was made some time after the completion of the northbound journey. The chief mate's notation was contemporaneous. The court below made no finding as to the direction of the wind and its direction, other than as related to the fact that it was a headwind, is immaterial. We find that the wind in question arose on August 9 and was a northeast wind as is stated in the chief mate's log.

heavy weather which the tanker encountered on her northbound trip from Curacao to New York and concluded as a matter of law that the discharge was caused by an unavoidable accident and was not a violation of the Act. The libel was dismissed and the United States appealed.

Section 3 of the Oil Pollution Act, 33 U. S.C.A. § 433, provides in pertinent part that "Except in case of emergency imperiling life or property, or unavoidable accident, collision, or stranding, * * * it shall be unlawful for any person to discharge, or suffer, or permit the discharge of oil by any method, means, or manner into or upon the coastal navigable waters of the United States * * *." The evidence establishes the fact that the Pan-Am had ten tanks to a side and that the hull of the vessel formed part of the tanks. It is conceded that oil was leaking from around rivets below the water line on both sides of the tanker while she was moored at the Cities Service Company's dock at Linden after the completion of the voyage from Curacao and on or about August 22, 1941. In proof of the asserted defense of unavoidable accident a deposition of the master and a log book kept by the chief mate were introduced in evidence. The log book showed that the Pan-Am had encountered northeast winds which varied between force 3 and force 5 on the Beaufort wind scale for a period of about two and a half days, whereupon the wind went around to the southwest and rapidly fell from force 4 to force 2. The master's log book also was introduced in evidence but no entries were made in it from July 15 to September 10. One entry dated August 11 reads: "Wind Northwest strong. Vessel's speed decreases at minimum. Ship suffered (illegible word). We remarked small [sic] of oil around vessel. Unable to found leakage." The entry in the master's log book was not made until after the trip had been completed. See note 1 supra. This explains the inconsistencies in the evidence.

The master testified that waves broke over the tanker's deck. It is conceded that force 5 on the Beaufort wind scale indicates a "fresh breeze". An oil tanker, heavily laden as was the Pan-Am, lying low in the water, might be expected to break water over her decks when moving into a fresh breeze. Such a circumstance is not unusual. While seas might grow in size around a vessel because of a distant storm without substantial increase in local wind pressures, there is no evidence to prove that the Pan-Am suffered damage from a distant storm. Winans, an inspector of the Office of the Supervisor of the New York Harbor, testified that if a tanker's rivets were in perfect condition, a wind force of from 60 to 70 miles an hour lasting for five days would be required in order to spring rivets. Winans testified also that rivets spring in storms which are less severe or of shorter duration if they are not tight, due to acid corrosion. He stated that when he discovered the leakage from the Pan-Am on August 22, 1941 he then saw practically the same conditions that he had seen at a previous inspection; that the vessel was leaking on both sides and there was a heavy oil slick in the water between the dock and the ship, the oil being of the same kind that the ship had on board as cargo.[2]

The learned trial judge also found as a fact that prior to her departure for New York and before loading oil at Curacao the Pan-Am "was duly inspected by those in charge of it and was found to be tight, staunch and seaworthy in every respect, and ready to receive cargo", and that after loading the oil the vessel was inspected again by those in charge of her and "was found to be tight, staunch and seaworthy in every respect". The evidence shows that the Pan-Am had been drydocked at Galveston in January, 1941, and had undergone general repairs and an overhauling of engines and hull; that a Lloyd's certificate of seaworthiness was issued to the vessel after this inspection; that the ship stranded off Cuba in June, 1941, was repaired and was given certificates of seaworthiness by both Lloyd's and Reuters. It also appears that the ship then proceeded to Tampico, where it was discovered that the rivets of No. 9 tank were loose and that the vessel was leaking and that the leaky rivets were punched out and specially machined bolts and washers were inserted. It is not clear whether another certificate of seaworthiness was then issued to the Pan-Am. The master testified in response to a leading

---

[2] The leakage referred to of May 19, 1941 was the subject of a suit brought in the court below, United States v. Pan Am, Action No. A-136(a). The libel was dismissed on the ground that the cause of leakage was stormy seas; that there was no wilfulness or intent to discharge the oil and that the discharge was the result of an unavoidable accident.

question by the claimant's proctor that the ship obtained a second Lloyd's certificate at Tampico. The court below also directed its inquiry to this subject. The proctor for the claimant replied: "I believe that she was [given a certificate]. The Captain testified that she was given another certificate then. I don't see it here in the log but the captain stated that she received two certificates if I am not mistaken."

If the vessel received a certificate of seaworthiness after the Tampico repairs were made she received four certificates of seaworthiness in all, a claim which is not made by the claimant's proctor. Moreover, the master seems not to have understood the English language well. The court below did not make a finding as to the number or sources of the certificates issued. The findings of the District Court which we have quoted find little support in the evidence. The master was asked the question, "Did you or a mate on your behalf examine the vessel while it was loading in Curacao and will you tell us what the result of your examination was?" The master replied, "No leaking." This constitutes substantially all the evidence proffered to this court to support the findings of the court below which we have quoted. Manifestly it is insufficient.

The law is well settled that no wilfulness or intent to discharge oil into the navigable coastal waters of the United States is necessary for the imposition of liability under the Oil Pollution Act or that an overt act must be found to have been committed in order to sustain a charge of violation. It is clear that unintended discharges of oil are prohibited by the Act but these may be excused if the discharge is due to unavoidable accident. See The Hegglund, 5 Cir., 100 F.2d 68, and the authorities therein cited. Compare The President Coolidge, 9 Cir., 101 F.2d 638.

Upon consideration of all the circumstances of the case at bar we conclude that the vessel has not offered sufficient evidence to support a finding that the leakage was due to unavoidable accident. The wind forces, the conditions of weather and sea, which the Pan-Am met in the course of her trip from Curacao to New York were not severe. A fresh breeze in the Atlantic Ocean and waves which break over a laden oil tanker's deck are normal conditions. They cannot support a defense of unavoidable accident under the Oil Pollution Act.

The judgment of the court below is reversed and the cause is remanded with the direction to enter a judgment in favor of the United States and against the vessel for a pecuniary penalty in such sum not exceeding $2,500 nor less than $500 as the facts warrant.