**UNITED STATES**
v.
**THE CATHERINE.**
No. 3567.

United States District Court
D. Maryland.
Nov. 13, 1953.

Bernard J. Flynn, U. S. Atty., Baltimore, Md., for the United States.

Ober, Grimes & Stinson, Randall C. Coleman, Jr., Baltimore, Md., for The Catherine.

WILLIAM C. COLEMAN, Chief Judge.

This is a suit in admiralty brought by the United States Government against the S. S. Catherine, a vessel of American registry using oil as fuel for the generation of propulsion power, for alleged violation of the Oil Pollution Act, 1924, 33 U.S.C.A. §§ 431–437, inclusive.

Section 433 of this Act makes it unlawful to discharge oil in any manner into or upon the coastal or navigable waters of the United States from any vessel using oil as fuel for the generation of propulsion power, or any vessel carrying oil in excess of amounts necessary for its lubricating requirements and such as may be required under the laws of the United States, and rules and regulations prescribed thereunder, "except in case of emergency imperiling life or property, or *unavoidable accident*, collision, or stranding," and except as otherwise permitted by Government regulation. (Emphasis supplied.) Section 434 of the Act makes any violation of Section 433 a misdemeanor and provides as penalty for each violation a fine not exceeding $2,500 nor less than $500, or imprisonment not exceeding one year nor less than thirty

days, or both. This Section further provides that any vessel, other than a vessel owned and operated by the United States, from which oil is discharged in violation of Section 433, shall be liable for any pecuniary penalty imposed upon the violator; that clearance of such vessel from a United States port may be withheld until payment of the penalty, and that the penalty shall constitute a lien upon such vessel, which may be recovered in proceedings by libel in rem in any United States District Court within which the vessel may be.

Testimony was given at the hearing by three witnesses: a United States Customs Service inspector and a United States Coast Guard investigator, on behalf of the Government, and the Chief Engineer of the S. S. Catherine, the accused vessel, who testified on behalf of her owners and operators, Drytrans, Inc.

It was conceded on the part of the Steamship that some fuel oil did escape from The Catherine into Baltimore Harbor at the time in question, but it is claimed that this was due to an unavoidable accident, and that therefore no violation of Section 433 of the Oil Pollution Act has occurred.

The Court finds the following facts: At the time in question, namely, during the evening of November 12, 1952, The Catherine was lying at the east side of the Pennsylvania Railroad grain elevator pier in Baltimore Harbor and was bunkering fuel oil, pumped from a barge alongside. When No. 5 tank had been filled, the vessel's chief engineer ordered the night engineer to close the valve in this tank, so that oil might be put into the afterpeak tank. The night engineer closed the valve and, as far as he could tell, it was closed completely. However, as later discovered but not until the valve was taken apart, a rag had become lodged in the seat of the valve which kept it from closing completely. As a result, oil seeped under the valve and ran up through the sounding pipes,—not through the vents provided for overflow of oil,—and overflowed upon the deck. As soon as this was discovered, the pumping of oil was stopped, and although all the overboard discharge ports, namely, the scuppers, had been closed before any pumping of oil was begun, nevertheless some oil overflowed the scuppers and the fishplates on both sides of the vessel. Sawdust was spread over the decks in order to absorb and minimize as much as possible any further discharge of oil over the vessel's sides. The quantity of oil that overflowed onto the vessel's deck was some eleven or twelve barrels, but, according to one of the Government witnesses, the amount that went overboard into the harbor was not over three barrels, and according to the other Government witness, not over five barrels.

Subsequent examination by the chief engineer failed to disclose definitely where the rag had come from, or just how it happened to become lodged between the seat and disk of the valve. The only testimony on this point was that of the chief engineer to the effect that it is not uncommon to find that foreign matter of various kinds has been left in the bottom of the tanks of vessels, following their original construction, and that gradually, over a period of time, it may work down to the suction line and be picked up when oil is pumped; that the rag must have come from the inside of the tank; and that the rag's presence in the valve was not capable of detection without taking the valve apart, which was later done, the rag's presence in the valve not being apparent by the mere opening and closing of the valve by the wheel provided for that purpose.

Proof of wilfulness or intent to discharge oil into the navigable coastal waters of the United States is not necessary in order to create liability under Section 433. Nor is proof of the commission of an overt act necessary in order to sustain the charge of violation. See The Panam, 3 Cir., 148 F.2d 925. However, unintended discharge of oil is excused if proved to be due to an "unavoidable accident" as provided in Section 433 of the Act.

We are satisfied from the weight of the credible evidence that, as respects

the question of the vessel's responsibility, presence of the rag in the valve was due to an unavoidable accident. Presence of such foreign substance in the valve is not shown to have been due to any negligence on the part of those in charge of the vessel, even assuming there may have been negligence in this respect on the part of those who constructed or installed the tank in the vessel. Such foreign matter might lie in the bottom of, or float around in a tank for a long while, without being sucked into the valve. But there is no proof in the present case that the tank had not been properly inspected and cleaned by those in charge of the vessel, to the extent of their obligation to do so. For aught that appears, the rag might have been present in the tank for some time, or it might have come in with the supply of oil that was being pumped into The Catherine's tanks on this particular occasion. Assuming the latter to have occurred, if the vessel employed the proper type of strainers and other equipment in receiving the oil into the vessel,—and there is no claim or testimony that such was not employed, or that the location of the strainer "beyond" the impaired valve was other than proper,—there is nothing upon which to predicate a claim of negligence on the vessel's part in letting the rag get into the valve, which had been working properly up to the time when the leak began.

The only point, therefore, that remains for consideration is whether, even though presence of the rag in the valve was an unavoidable accident as respects the vessel's responsibility, the vessel's personnel had used due care and diligence in (a) detecting the leak; (b) stopping the further pumping of oil, and (c) closing the scuppers. The contention was made on behalf of the Government that, in any event, the overflow of oil should have been detected and stopped before any amount as substantial as three or four barrels had gotten into the Harbor over the vessel's sides; in other words, that there was negligence in not having closer supervision on deck at all times while the oil was being bunkered, in order to detect any possible overflow on to the deck. On this point, however, the testimony of the chief engineer of The Catherine stands unrefuted that besides himself, there were two other men constantly on deck during the loading of the oil. They happened to be up forward, sounding the forward tanks but this was the normal procedure. The night mate apparently discovered the leak several minutes after it began,—although there is no definite testimony as to the time that had elapsed,—and immediately notified the chief engineer who forthwith stopped the pumps. In the present instance the leak was through the sounding pipes,—not the vents,—of number 5 tank—a most unusual place for it to occur. The sounding pipes go to the bottom of the tank, and leakage of the oil in the tank was not high enough to push it through the vents, although it was just high enough to push it up and out of the sounding pipes. The chief engineer testified that the afterpeak tank he was then filling had a capacity for 924 barrels, and that this had not been even nearly reached when the leak at number 5 tank occurred. Thus, there was no reason to anticipate or fear *any* overflow, much less an overflow from the unusual, unforeseeable place where it did occur, or *to take more precautions than were taken*.

From the aforegoing facts, therefore, I find: (1) that the presence of the rag in the valve was an unavoidable accident; (2) that the resultant leak in the valve up through the sounding pipes was likewise an unavoidable accident; and (3) that there was no negligence on the part of those in charge of the vessel while the oil was being loaded into her tanks on the night in question, as respects sounding the tank; or not sooner detecting and stopping the flow of oil on to the deck; or as respects the means employed, or not employed to prevent discharge into the Harbor, after the overflow on to the deck had been detected and stopped.

For the aforegoing reasons the libel must be dismissed.