UNITED STATES

v.

THE CATHERINE.

No. 6732.

United States Court of Appeals
Fourth Circuit.

Argued March 17, 1954.

Decided April 5, 1954.

Irving Segelman, pro se., for appellant.

John W. McIlvaine, U. S. Atty., Pittsburgh, Pa., Dail E. Sloan, Asst. U. S. Atty., Brownsville, Pa., for appellee.

Before BIGGS, Chief Judge, and KALODNER and STALEY, Circuit Judges.

Cornelius J. Peck, Atty., Department of Justice, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., George Cochran Doub, U. S. Atty., Baltimore, Md., and Samuel D. Slade, Atty., Department of Justice, Washington, D. C., on the brief), for appellant.

Randall C. Coleman, Jr., Baltimore, Md. (Ober, Grimes & Stinson, Baltimore, Md., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal from a judgment for defendant in a suit instituted against the S. S. Catherine to recover a penalty for alleged violation of the Oil Pollution Act of 1924, 33 U.S.C.A. §§ 431–437. It was conceded on the part of the vessel that a few barrels of fuel oil did escape while she was lying at a pier and taking on fuel in Baltimore harbor, but she claimed that this was the result of unavoidable accident within the meaning of the statute and that no penalty had been incurred. The trial judge so found; and the United States has appealed.

The facts are fully set forth in the opinion of the court below, see United States v. The Catherine, 116 F.Supp. 668, and may be briefly stated here. The Catherine was lying beside a grain elevator pier in Baltimore harbor and was bunkering fuel oil which was being pumped from a barge lying alongside her. The scuppers had been closed and other usual precautions taken before the pumping began; but after the double bottom tanks had been filled and the filling of the afterpeak tank had begun, it was discovered that oil was spilling on the deck. This occurred because a rag had been caught in the valve which closed the line leading to one of the tanks which had been filled, with the result that the complete closing of the valve was prevented and oil was allowed to escape therefrom. When the situation was discovered, the pumping was immediately stopped and everything was done that could reasonably have been done to prevent the oil from going overboard into the harbor. According to the government's witnesses, not over three to five barrels went overboard.

The facts with respect to the presence and discovery of the rag are thus correctly stated in the brief of counsel for the United States:

"When the chief engineer went below he examined the valve on the line leading to the number 5 fuel tank. He testified that the night engineer had closed it with a wrench

on the order to secure the tank. However, upon taking the valve apart the chief engineer found a rag jammed down between the valve seat and the valve disk. The rag was not visible from the outside and the night engineer apparently thought he had closed the valve. However, the rag had prevented complete closure. The afterpeak tank is about six feet higher than the double bottom tanks, and the chief engineer used a pressure of 65 to 75 pounds in pumping oil into that tank whereas 15 or 16 pounds of pressure is sufficient to raise oil up the sounding pipes from the double bottom tanks. This increased pressure was obviously more than sufficient to force the oil through the incompletely closed valve into number 5 tank, up the open sounding pipes, and out on the deck. The pressure was not great enough to force oil out through the vents of the fuel tank, where leaks more commonly occur. There was no positive testimony as to how the rag came to be lodged in the valve. The chief engineer testified that it was 'pretty well' soaked with oil and that it was not new."

With respect to the presence of the rag in the valve, the trial judge said:

"Subsequent examination by the chief engineer failed to disclose definitely where the rag had come from, or just how it happened to become lodged between the seat and disk of the valve. The only testimony on this point was that of the chief engineer to the effect that it is not uncommon to find that foreign matter of various kinds has been left in the bottom of the tanks of vessels, following their original construction, and that gradually, over a period of time, it may work down to the suction line and be picked up when oil is pumped; that the rag must have come from the inside of the tank; and that the rag's presence in the valve was not capable of

detection without taking the valve apart, which was later done, the rag's presence in the valve not being apparent by the mere opening and closing of the valve by the wheel provided for that purpose.

\* \* \* \* \* \*

"We are satisfied from the weight of the credible evidence that, as respects the question of the vessel's responsibility, presence of the rag in the valve was due to an unavoidable accident."

The findings of the trial judge were as follows:

"I find: (1) that the presence of the rag in the valve was an unavoidable accident; (2) that the resultant leak in the valve up through the sounding pipes was likewise an unavoidable accident; and (3) that there was no negligence on the part of those in charge of the vessel while the oil was being loaded into her tanks on the night in question, as respects sounding the tank; or not sooner detecting and stopping the flow of oil on to the deck; or as respects the means employed, or not employed to prevent discharge into the harbor, after the overflow on to the deck had been detected and stopped."

The pertinent portion of the statute, 33 U.S.C.A. § 433, for violation of which the penalty is asked is as follows:

"Except in case of emergency imperiling life or property, or unavoidable accident, collision, or stranding, and except as otherwise permitted by regulations prescribed by the Secretary as in sections 434 to 437 of this title inclusive, authorized, it shall be unlawful for any person to discharge, or suffer, or permit the discharge of oil by any method, means, or manner into or upon the coastal navigable waters of the United States from any vessel using oil as fuel for the generation of propulsion power, \* \* \*."

This statute, which was enacted for the protection of the interest

of the public in the navigable waters of the United States, is entitled to the liberal construction accorded remedial legislation. It is perfectly clear, we think, that it is not necessary to show wilfulness or intent to establish a violation and that where the escape of oil from a vessel into navigable waters is shown, the burden rests upon those who would avoid liability therefor to bring themselves within one of the exceptions of the statute. As said by Judge Sibley, speaking for the Court of Appeals of the Fifth Circuit in Hegglund v. United States, 5 Cir., 100 F.2d 68, 69:

"There are older laws to protect the harbors and coastal waters from pollution, but they deal with refuse less motile than oil. The Act of 1924 deals expressly and wholly with oil carried in quantity as fuel or cargo, a substance most likely to escape of its own movement and cause a fire hazard by spreading over the waters, or to befoul the beaches, or to injure seafood, or destroy marine life. The prevention of these things is indicated by the Act itself as its object. Oil upon the waters is as harmful if its presence be due to inattention as if due to design. The language of the Act is broad enough to protect against both cases. The words: 'It shall be unlawful for any person to discharge * * * oil * * * into or upon the coastal navigable waters of the United States from any vessel using oil as fuel * * * or * * * carrying or having oil thereon in excess of that necessary for its lubricating requirements', would easily and naturally refer to voluntary acts of discharge, and might be restricted to such. But the words are added: 'or suffer, or permit the discharge of oil by any method, means, or manner'. Remembering the tendency of oil to discharge itself at every opportunity, these sweeping words seem intended to require vigilance and foresight to prevent it.

An escape of oil which could have been foreseen and prevented is a discharge suffered or permitted within the intent of the Act. This construction seems the more reasonable when we note the words of exception: 'Except in case of emergency imperiling life or property, or unavoidable accident, collision, or stranding, and except as otherwise permitted by regulations.' Section 3, 33 U.S.C.A. § 433. The exceptions of emergency and regulations, and perhaps stranding, seem to contemplate voluntary discharges of oil, but unavoidable accident and collision apply peculiarly to unintended discharges of oil. The latter show that unintended discharges are in general prohibited, but are to be excused in case of unavoidable accident or collision."

See also The Pan-Am., 3 Cir., 148 F.2d 925, 927.

We agree with the learned District Judge, however, that the vessel here has clearly shown that the escape of oil with which she is charged was the result of unavoidable accident within the exception of the statute. An unavoidable accident is one which could not have been avoided by that degree of prudence, foresight, care and caution which the law requires in the particular case. San Pedro, L. A. & S. L. R. Co. v. United States, 9 Cir., 220 F. 737, 744 and cases there cited. As said by Judge Cranch in Hodgson v. Dexter, Fed.Cas. No.6,565, 1 Cranch C.C. 109, "By common acceptation, unavoidable accident means, a casualty which happens when all the means which common prudence suggests have been used to prevent it". And see 43 Words and Phrases, Unavoidable Accident, pp. 38–44. What is an unavoidable accident within the meaning of the statute was the question before the Court of Appeals of the Fifth Circuit in Hegglund v. United States, supra, where the court held that the escape of oil from a leaking ship whose condition was known could not be held an unavoid-

able accident, but that the discharge would be held an unavoidable accident, if the ship had been duly inspected and there was no reason to expect that oil would be discharged from her. The court said:

> "We hold that if the Bidwell was a tight ship, duly inspected, and loaded without any previous reason to expect that oil would be discharged from her but that it did leak out unavoidably from some accidental or unknown cause, there would be a discharge through unavoidable accident. But if she was known to be likely to leak when loaded, the master could not claim an unavoidable accident when she did thus leak."

And see The Sunset Una, D.C., 54 F. Supp. 464.

█ The vessel here clearly carried the burden of showing that the escape of the oil was due to unavoidable accident when it showed that the escape resulted from the rag's being caught in the valve. No one could reasonably have foreseen a casualty of this sort, and the possibility of its occurring was so remote as not to require any special inspection to prevent it. There is no suggestion that the vessel was not properly inspected; and, if there had been any reasonably foreseeable danger of any such happening as occurred, or if any sort of inspection to guard against it had been customary or required in the exercise of ordinary care, it is a reasonable assumption that these would have been called to the attention of the court by the government engineers under whose direction the suit was prosecuted.

The government contends that the trial judge held that the burden of proof was on the government to establish negligence. We do not so interpret his opinion, and it was not so interpreted by those who reported it for publication, as shown by the headnotes. We need not go into this, however, since it is perfectly clear that, with the burden upon the vessel to negative negligence in the

escape of the oil and establish that such escape was due to unavoidable accident, the burden has been met and unavoidable accident established.

Affirmed.