**UNITED STATES of America**

v.

**BARGE BOULDER.**

No. 9219.

United States District Court
W. D. Louisiana,
Lake Charles Division.

Jan. 13, 1964.

Edward L. Shaheen, U. S. Atty., Leven H. Harris, Asst. U. S. Atty., Shreveport, La., for libelant.

Jones, Kimball, Harper, Tete & Wetherill, Lake Charles, La., for respondent.

HUNTER, District Judge.

The motion for a rehearing is denied. The Court specifically sets forth its findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) At all times material hereto the Barge Boulder was owned and operated for the transfer of crude oil within the jurisdiction of this Court by Barge Transport Company, Inc., of Houston,

Texas, in the tow of its Tug, the "Helen M."

(2) On or about the 8th day of September, 1961, crude oil was discharged or permitted to be discharged from the Barge Boulder into the Gulf Intracoastal Waterway at what is known as Calcasieu Locks approximately twelve (12) miles South of Lake Charles in Calcasieu Parish, Louisiana.

(3) At the time of its discharge or leakage of oil as aforesaid, the Boulder was laden with crude oil taken on at Lafitte Oil Traders' Docks on the Mermentau River, where it was inspected both before and after loading by Lafitte's dock operator, Lee Nichols, and undisputedly found to be tight, seaworthy and without leaks.

(4) The Boulder was certified as having satisfactorily undergone the inspections required by law and Coast Guard regulations, and it had no record of previous leaks.

(5) The Boulder was, therefore, a tight, seaworthy barge, duly inspected and loaded without any reason to expect that oil would leak or be discharged from her into navigable waters.

(6) After the discovery of its leak from an underwater forward point, the Barge was allowed to proceed to the Cities Service Refinery, on Calcasieu River, where it discharged its cargo.

(7) After finding haven from the storm Carla, up-stream on the Calcasieu River for some two (2) or three (3) days, the barge was taken for repairs to the A. B. Zigler Co. Shipyard near Jennings, Louisiana where its bottom was found to be upset and with a split knuckle in the No. 1 port tank approximately two feet (2') aft of the forward rake tank bulkhead, and some thirty-six inches (36") below the barge's water line on the forward curve of its bottom. Careful testing after the repair of this damage failed to reveal any other leak.

(8) By the unrefuted testimony of Mr. Louis Smailhall, the Manager of the Zigler Shipyard and Mr. G. K. Miller, Maintenance Man for Barge Transport, Inc., who examined the split knuckle, it was shown that the nature and location of the damage indicated that it could only have been caused by the striking of a submerged object.

(9) The Helen M and its tow were carefully operated on the voyage from Lafitte's loading dock to the Calcasieu Locks and none of the crew who testified was conscious of the striking of any object submerged or otherwise. The noise and vibration of the Helen M's motor, however, was sufficient to prevent notice of any striking of a submerged object by the Boulder, which was the lead barge in the two barge tow, which was being pushed by the Helen M.

CONCLUSIONS OF LAW

(1) This Court has jurisdiction of the action and venue is properly laid in the Western District of Louisiana.

(2) On or about the 8th day of September, 1961, oil was discharged from the Barge Boulder into navigable waters of the United States as defined by the Oil Pollution Act of 1924 (33 U.S.C.A. § 433).

██ (3) The discharge or leaking of oil from the Boulder arose from an unavoidable accident as defined in Hegglund v. United States (5 C.A., 1938) 100 F.2d 68, and applied in United States v. The Catherine (4 C.A., 1954) 212 F.2d 89, 93. In Hegglund the tanker, the Bidwell, was shown to have been a leaky vessel for several years prior to the offense in question, when it was found to be leaking oil on both sides. Because of the vessel's record of leakiness and the master's knowledge thereof, his conviction under the Act was affirmed, with the dissent of Judge Hutcheson, who thought the conviction was not justified under the Act. In its interpretation of the statute, the Court found (100 F.2d 70) that:

"An escape of oil which could have been foreseen and prevented is a discharge suffered or permitted within the intent of the Act. This construction seems the more reasonable when we note the words of exception: 'Except in case of emergency

imperiling life or property, or unavoidable accident, collision, or stranding, and except as otherwise permitted by regulations.' Section 3, 33 U.S.C.A. § 433. The exceptions of emergency and regulations, and perhaps stranding, seem to contemplate voluntary discharges of oil, but unavoidable accident and collision apply peculiarly to unintended discharges of oil. The latter show that unintended discharges are in general prohibited, but are to be excused in case of unavoidable accident or collision."

In addition the Court very positively said:

"We hold that if the Bidwell was a tight ship, duly inspected, and loaded without any previous reason to expect that oil would be discharged from her but that it did leak out unavoidably from some accidental or unknown cause, there would be a discharge through unavoidable accident."

The last quoted statement not being essential to the decision could be treated as obiter dictum except for the fact that the Court clearly indicated by the expression "We hold * * *", that the establishment of a definite rule for future guidance in such cases was intended. This was obviously the view of the Court of Appeals for the Fourth Circuit, which quoted and followed the rule in The Catherine, supra, saying (212 F.2d 92–93):

"What is an unavoidable accident within the meaning of the statute was the question before the Court of Appeals of the Fifth Circuit in Hegglund v. United States, supra, where the court held that the escape of oil from a leaking ship whose condition was known could not be held an unavoidable accident, but that the discharge would be held an unavoidable accident, if the ship had been duly inspected and there was no reason to expect that oil would be discharged from her."

In support of its motion for rehearing the United States has cited several cases, only two of which (The Columbia (2 C.A., 1918) 255 F. 515, and The Pan-Am (3 C.A., 1945) 148 F.2d 925) involve violations of navigable water pollution acts. The Columbia involved enforcement of the New York Harbor Pollution Act (33 U.S.C.A. § 441), which specifically deprived offenders thereunder of any defense based on unavoidable accident and the Pan-Am was found (as was the Bidwell in Hegglund) to have been leaking at the seams periodically a long time before the offense then in question. The other cases cited were suits for collision damage in which the defense of inevitable accident was raised and, being in a different field of admiralty, cannot be applied to overcome the rule of Hegglund and The Catherine established for guidance in suits brought under the Oil Pollution Act. Libelant's cases are, therefore, found to be inapposite.

The motion for new trial is accordingly denied.