[Civ. No. 8468. Second Appellate District, Division One.—December 19, 1934.]

DON BLESER, Appellant, v. THOMAS HAVERTY COMPANY (a Copartnership) et al., Respondents.

Lasher B. Gallagher for Appellant.

W. I. Gilbert for Respondents.

ROTH, J., *pro tem.*—This appeal is from a judgment of nonsuit.

Plaintiff was employed by Howe Bros., who, as an independent contractor, was installing plumbing fixtures in the Edison building in Los Angeles. Defendant Haverty, as a separate independent contractor, was installing sheet metal work in the same building. Defendants Miller and Galloway were employees of Haverty.

Between 9 and 10 A. M. on June 24, 1930, when the accident occurred from which this lawsuit arises, defendant employees had prepared a scaffold 12 feet high (which will

hereafter be referred to as the Haverty scaffold) as the base from which they were to perform their work. Plaintiff, as an employee of Howe Bros., was constructing a second scaffold (which will be referred to as the Howe scaffold) at right angles and immediately contiguous to the Haverty scaffold. In the construction of the Howe scaffold plaintiff was assisted by one Azzoni, also an employee of Howe Bros. Defendants Miller and Galloway also assisted, although it is not clear from the evidence whether they did so from their own volition or at the request of plaintiff.

During the construction plaintiff was at the top of the Howe scaffold, standing or kneeling on one plank that had already been laid over two "horses" 12 feet high. While he was in this position his fellow employee Azzoni would climb a ladder-like arrangement built into one of the horses, holding the rungs of the ladder with his left hand while one end of the planks which were to form the base of the scaffold and which were 2 inches by 12 inches by 18 feet long rested on the palm of his right hand, much as a "waiter carrying a tray". The defendants Miller and Galloway carried the other end of the planks, gradually "feeding" the same as Azzoni mounted the ladder until he had attained enough height to hand the planks to plaintiff. After plaintiff grasped the planks Miller and Galloway on the floor beneath would continue the feeding process until plaintiff, with the aid of another employee of Howe Bros. at the other end, was in a position to lift the planks out of their grasp and lay them on the horses.

In this manner three planks had been laid. In attempting to lay the fourth the accident occurred, according to eye-witnesses, in the following manner:

Azzoni testified:

"A. Yes. When I handed my end to him and I started to come down, and Bleser was on his knees shoving the plank—or pulling the plank with him as he went back to the center of the scaffold, and these two Haverty men were gradually feeding it to him, just holding up their end and feeding it to him, when I was just about down, I heard him say, 'Whoa!' or 'Hold it!' and just that second I saw him fall, and his right arm caught over the plank I was standing on, and swung his feet underneath that, inward, and his ankle caught on a cross beam of the horse, and that kind of turned him over, and he went face downward

towards the concrete, and he lit on his elbows and his face. . . . ''

The witness Brazelton testified:

"A. He just took hold of the plank, on his knees, and crawled maybe three or four feet and told the men to 'Stop!' and 'Ho!' or 'Hold!' as he said . . . Q. And did you see them do anything immediately thereafter? A. They were still shoving the plank. Q. After he had told them to stop? A. Yes, sir. Q. And what happened to Bleser? A. He fell off; lost his balance and fell off of the plank. Q. Now, at the time Mr. Bleser—withdraw that. Just prior to the time Bleser went off of the scaffold, what was he doing with reference to his position; was he still down on his knees, or was he doing something else? A. Mr. Bleser, you mean? Q. Yes. A. He was on his knees. . . . Q. . . . That is, was there any sheet between them, of anything? A. Nothing. Q. Nothing — nothing but air? A. That is all.'' . . .

The plaintiff Bleser testified:

"A. Why, when they were handing up the plank—I was standing up, first, when they were handing up the plank, and I naturally got down on my knees to reach the plank and get the end of it on the horse. After it was on the horse, I pulled the end say about a foot, and then I said 'Hold it!' I wanted to change my position. I had it between my legs. I said, 'Hold it!' and I was just going to swing my right leg around to get on the Haverty scaffold along with the plank then, and just as I did that they shoved on it and knocked me over. . . . Q. When you said 'Hold it,' was there any stopping in the motion of the plank at all? A. There was for maybe two or three seconds. Q. And then what happened? A. And then they got up and shoved all of a sudden, and that was what overbalanced me.'' . . .

The defendant Galloway testified:

"Q. 'The first thing he said was that you pushed him? A. That is the first thing he said, yes.' So you did give those answers to those questions, didn't you? A. Yes, sir. Q. So you did have a conversation with Mr. Bleser immediately after the accident, didn't you? A. No, sir. Q. Well he told you you pushed him off, didn't he? A. Well that is no conversation.''

It appears from the evidence that in doing their respective jobs at this place in the Edison building, the Haverty men followed the Howe men. The record shows that the Howe scaffold, the completion of which was temporarily delayed by the accident, was thereafter completed and that the same afternoon and on the following day the Haverty men, having done all the work they could using the Haverty scaffold as an operating base, proceeded to use the Howe scaffold, doing all they could in the line of their work with the Howe scaffold as an operating base.

Defendants' motion for nonsuit was based on the grounds that defendants were not guilty of negligence; that the evidence was wholly insufficient in law to establish a cause of action; that the undisputed testimony showed that no contractual relation existed between the parties, for which reason no legal duty rested upon the defendants to take any particular care or exercise any particular caution, but that they were merely volunteers and that as such the limit of their duty was to refrain from wanton or intentional injury to the plaintiff.

That on a motion for nonsuit all the evidence of plaintiff must be accepted as true and all inferences that can be drawn therefrom in plaintiff's favor must be drawn is too trite a principle to need citation of authority for its acceptance. Measuring the evidence in the light of this principle, we feel that the motion for a nonsuit was erroneously granted. It may be conceded as a fact that defendants owed no contractual duty of assistance to plaintiff. But this concession of fact is immaterial. The sole questions are: Did the employees of Haverty render the assistance they gave within the scope of their employment and, if they did, what degree of care was required of them under the law?

It is true that the evidence does not show an express agreement, oral or in writing, made prior to the accident between the respective employees of the respective independent contractors that the Howe scaffold was to be subsequently used by defendants, and if defendants had rested their case we would be bound to agree with what was evidently the trial court's conclusion,—that there was none. But it requires no mental strain to infer from the evidence that the defendants Miller and Galloway assisted in the construction of the Howe scaffold because they were to use

it properly and in the scope of their employment as a base for their own work as, in fact, the evidence demonstrates they did. If this inference be sound, and we think it is, the defendants were not volunteers but employees of one separate contractor assisting the employees of a second separate contractor in the construction of a scaffold which both were to use in the performance of their labors. It is true that there was no compulsion, contractual or otherwise, requiring Haverty's employees to assist in the construction of the Howe scaffold at the time, but it is fair to assume from the evidence that they figured they would save the time of their employer if they did so rather than leave to chance his right to subsequently use the Howe scaffold. The assistance the Haverty employees rendered was both workmanlike and in the scope of their employment, unless it can be found that to save the time of one's employer by cooperating with the employees of a separate employer in the doing of a preliminary piece of work essential to the performance of the labors of each separate contractor was specifically unauthorized or in some manner inimical to their employers' interests. Neither of these elements is shown by or can be inferred from the evidence and, under the rule of nonsuit which we have already announced, our duty would be to draw no such adverse inferences.

 When the act of an employee is connected, directly or indirectly, with the business of the employer and in furtherance of the work the employee is directed to perform and the act is calculated to result directly, indirectly or incidentally to the benefit of the employer, there can be no question that such act is within the general scope of the servant's employment. (*Kish* v. *California S. Automobile Assn.*, 190 Cal. 246, 249 [212 Pac. 27] ; *Chamberlain* v. *California Edison Co.*, 167 Cal. 500, 506 [140 Pac. 25] ; *Mullia* v. *Ye Planry Building Co.*, 32 Cal. App. 6 [161 Pac. 1008] ; *Gousse* v. *Lowe*, 41 Cal. App. 715, 719 [183 Pac. 295].)

 The care which is required under such circumstances is well stated in *Grogan* v. *J. H. Hinkle & Co., Inc.*, 70 Pa. Sup. Ct. 585, 588, where it is said:

" . . . It is the duty of independent or different masters engaged about the same general employment to use such ordinary care and diligence in the conduct and prosecution of their several contracts of employment so as not to expose the servants of the master working with them to danger.

And if injury results to the servants of either, through failure to exercise such care and diligence, the master whose servants caused the injury will be liable in damages. . . . '' (*Spry Lumber Co.* v. *Duggan*, 182 Ill. 218 [54 N. E. 1002] ; *Fetzer* v. *Noel Constr. Co.*, 175 Ill. App. 401; *Variety Mfg. Co.* v. *Landaker*, 129 Ill. App. 630 (affd. 227 Ill. 22 [81 N. E. 47] ; *Grogan* v. *J. H. Hinkle & Co., Inc., supra.*)

The cases last cited deal with situations in which the servants of the independent contractors were engaged in separate work in their several capacities rather than in a piece of work in which they had joined to better and more efficiently accomplish their several tasks. We see no reason, however, why the rule is not as applicable to the instant situation as it is to the facts of the cases cited.

Analyzing the evidence as summarized, together with the brief excerpts quoted and keeping in mind that a nonsuit cannot be granted if there is any evidence which will support plaintiff's position that there was a legal duty existing and a lack of .ordinary care in the observance thereof, we are impelled to the conclusion that a jury could have reasonably inferred from the evidence as it existed at the time the motion for nonsuit was made that there was a duty and a lack of ordinary care in the performance thereof.

The evidence shows no contributory negligence as a matter of law and we are of the opinion that the principle of assumption of risk has no application to the facts.

Judgment of nonsuit reversed.

Conrey, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 8, 1935, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 14, 1935.