[Civ. No. 45649. First Dist., Div. One. May 22, 1980.]

CHARLES PHILLIP TEMPLE, Plaintiff and Appellant, v. SOUTHERN PACIFIC TRANSPORTATION COMPANY, Defendant and Respondent.

COUNSEL

Duenow, Burke & Smith and Christopher A. Helenius for Plaintiff and Appellant.

Pohle, Barry & Russell and William H. Pohle, Jr., for Defendant and Respondent.

OPINION

**ELKINGTON, J.**—Plaintiff Charles Phillip Temple appeals from a summary judgment in favor of Southern Pacific Transportation Com-

pany (sometimes hereafter the company) in an action commenced by him under the Federal Employers' Liability Act (45 U.S.C. § 51 et seq.).

The Federal Employers' Liability Act (§ 51) provides, as relevant: "Every common carrier by railroad while engaging in [interstate] commerce...shall be liable in damages to any person suffering injury *while he is employed by such carrier in such commerce*...resulting in whole or in part from the *negligence of any of the...employees of such carrier*,..." (Italics added.)

The action also concerns another federal act relating to such common carriers by railroad, termed the Hours of Service Act (45 U.S.C. § 61 et seq.). As relevant and at the times with which plaintiff's action was concerned, section 62 stated: "It shall be unlawful for any common carrier...to require or permit an employee, in case such employee shall have been continuously on duty for [12] hours, to continue on duty or to go on duty until he has had at least ten consecutive hours off duty...; or...he has not had at least eight consecutive hours off duty during the preceding twenty four hours...."

The facts before the superior court were substantially undisputed.

Southern Pacific Transportation Company was engaged in interstate commerce as a common carrier by railroad. Plaintiff Temple, who resided at San Luis Obispo, was a brakeman employed by the company. His customary employment was on a freight run from San Luis Obispo to Watsonville and back to San Luis Obispo. Because of the Hours of Service Act, after the train's arrival at Watsonville its crew was required to "layover" at that point for eight or more hours before the train's southern departure. The time of departure was ordinarily uncertain because of the need to make up new trains of southbound cars.

Some years before, the train crews' layover facility had been a dormitory maintained by the company at its Watsonville yard. After the dormitory burned down in 1971 the layover was usually in a Watsonville hotel chosen by the crew's engineer. The company reimbursed the crew members for their meals and for the reasonable costs of the hotel rooms; above average room accommodations were partially paid for by the men. The company ordinarily furnished transportation between its railroad yard and Watsonville, but some of the various crews' members

maintained their own vehicles in the company yard for their, and their fellows', convenience. This practice was known and unobjected to by the company; it "neither encouraged nor discouraged this practice...."

During the hours of the Watsonville layover the company's employees were free to do anything they wished; as stated by the company, the employee "was free to stay where he wanted, go where he wanted, and do what he wanted." There was but one requirement; at the period's end the men were required to let the company's dispatcher know where they could be reached and told when to report back for the trip to San Luis Obispo. After expiration of the layover their time was no longer their own. If not previously so notified, they were subject to the company's orders and required to await a call back to work, a call which might occur at any time. As stated by the company each crew member must "maintain contact" and be "reachable at the time when his crew is called."

The engineer of plaintiff's crew, one Shannon, permissibly maintained an old Volkswagen at the company yard for use during the Watsonville layover periods. On September 19, 1973, when the train was at the Watsonville terminal, Shannon used the vehicle in transporting himself, plaintiff and apparently other crew members to his chosen hotel in the town for the required layover. About four hours after the layover's end, the waiting crew members were ordered by the company to return to their train within the hour. Plaintiff, Shannon and another crew member were proceeding to the railroad yard in the Volkswagen, driven by Shannon, when it collided with another vehicle. As a proximate result of the accident plaintiff suffered grievous bodily injuries.

The instant Federal Employers' Liability Act action followed. It was contended therein by plaintiff that his injuries were sustained within the scope of his, and Shannon's, employment by the company, as a proximate result of the negligence of Shannon.

The basic question tendered the superior court on the company's motion for summary judgment was whether the evidence established a triable issue of material fact. (Code Civ. Proc., § 437c, 3d par.) The specific issue was whether plaintiff and Shannon, under the above described factual context, were acting within the scope of their employment at the time of the accident. The same question and issue are now presented for our consideration.

We note initially, and emphasize, that we are *not* called upon to, nor do we, determine whether a railroad company employee awaiting orders at or traveling from his *home* to report to work, or who is actually enjoying the freedom of his layover period, is engaged or acting within the scope of his employment.

■ Our inquiry is thus narrowed to the question whether at the end of the layover period, plaintiff and Shannon had resumed their employment by the company.

■ We follow the rule that, the Federal Employers' Liability Act will be liberally construed by the courts to effectuate its purpose of benefiting and protecting railroad employees. (*Johnson* v. *Southern Pacific Co.* (1904) 196 U.S. 1 [49 L.Ed. 263, 25 S.Ct. 158], *passim; Sowards* v. *Chesapeake & O. Ry. Co.* (4th Cir. 1978) 580 F.2d 713, 714; *Baker* v. *Baltimore & Ohio Railroad Company* (6th Cir. 1974) 502 F.2d 638, 641.)

"[I]t can no longer be seriously suggested that an employee of a carrier is covered by the [Federal Employers' Liability Act] only when he is actually at work on his job,..." (*Metropolitan Coal Company* v. *Johnson* (1st Cir. 1959) 265 F.2d 173, 177; and see *Morris* v. *Pennsylvania R. Co.* (2d Cir. 1951) 187 F.2d 837, 841.)

The principle with which we are concerned has received much consideration by the reviewing courts of this state. *Kish* v. *California S. Automobile Assn.* (1922) 190 Cal. 246, 249 [212 P. 27], informs us in this manner: "In determining whether a particular act is within the scope of the servant's employment, it is obvious that if the servant is directly engaged in the duties which he was employed to perform, or if his acts are directly producing the result desired by the master, that the servant is at that time in the course of his employment. It is not, however, necessary in order to hold the master liable, that the servant shall be engaged in the direct performance of the thing which is the ultimate object of his employment, for also *included within the scope of the servant's employment are those acts which incidentally or indirectly contribute to the service....* [¶] The test...for determining whether or not a particular act was done in the course of the servant's employment 'is whether the act was done in the prosecution of the business in which the servant was employed to assist.' *The act of the servant must be connected directly or indirectly with the business of the employer and be*

*in furtherance of the object for which the servant was employed. In other words, if the act is for the benefit of the employer, either directly or incidentally, the act is within the general scope of the servant's employment,* but if the act performed is not in any way connected with the service for which he is employed, but for his own particular and peculiar purpose, then the act is not within the scope of the employment." (Italics added.)

To the same effect see *Chamberlain* v. *California Edison Co.* (1914) 167 Cal. 500 [140 P. 25], *passim; Harris* v. *Oro-Dam Constructors* (1969) 269 Cal.App.2d 911, 915-916 [75 Cal.Rptr. 544]; *Vellis* v. *Albertson* (1968) 267 Cal.App.2d 285, 289-290 [72 Cal.Rptr. 841]; *McIvor* v. *Savage* (1963) 220 Cal.App.2d 128, 136-137 [33 Cal.Rptr. 740]; *Duffy* v. *Griffith Co.* (1962) 206 Cal.App.2d 780, 794 [24 Cal. Rptr. 161]; *Bleser* v. *Thomas Haverty Co.* (1934) 3 Cal.App.2d 199, 204 [38 P.2d 873]; *Gammon* v. *Wales* (1931) 115 Cal.App. 133, 137-138 [300 P. 988].

Further such authority is found in *Neal* v. *Gatlin* (1973) 35 Cal. App.3d 871, 875 [111 Cal.Rptr. 117], where it is said: "[An] employee is acting in the course and scope of his employment 'when he is engaged in work he was employed to perform or *when the act is an incident to his duty and was performed for the benefit of his employer and not to serve his own purposes or conveniences.'* . . . If the object or end to be accomplished is within the employee's express or *implied authority* his act is deemed to be within the scope of his employment irrespective of its wrongful nature." (Italics added; see authority there collected.)

"'It is not necessary that the servant is directly engaged in the duties which he was employed to perform, but *included are also missions which incidentally or indirectly contribute to the service, incidentally or indirectly benefit the employer.'*" (Italics added; *Harvey* v. *D & L Construction Co.* (1967) 251 Cal.App.2d 48, 52 [59 Cal.Rptr. 255]; *Boynton* v. *McKales* (1956) 139 Cal.App.2d 777, 789 [294 P.2d 733].)

And, "the general rule is that if the activity in which the agent was engaged at the time of the tort complained of was within the scope of his employment, the fact that the automobile used by him and which caused the injury, belonged to the agent, will not preclude the person injured in recovering from the employer, if the agent's use of the vehicle was, either expressly or *impliedly*, authorized by the employer." (Italics

added; *Curcic* v. *Nelson Display Co.* (1937) 19 Cal.App.2d 46, 52 [64 P.2d 1153]; see also *Ryan* v. *Farrell* (1929) 208 Cal. 200, 202 [280 P. 945]; *Boynton* v. *McKales, supra,* 139 Cal.App.2d 777, 790.) (Here, from Shannon's permissive storage of his automobile at the company yard, the company's knowledge that it was being used to transport train crew members to and from Watsonville for the required layovers, and the probable consequent savings and convenience to the company, a trier of fact might reasonably conclude that Shannon's use of the vehicle was *impliedly* authorized.)

▪ Under these criteria it becomes patent that at the termination of their layover period, plaintiff and Shannon, compulsorily standing by awaiting the company's call to return to work, and thereafter proceeding to it in response to the company's summons, might reasonably be deemed acting within the scope of their employment.

Moreover, it has been *expressly* held, under the Hours of Service Act, that *post* layover activity (and inactivity) of railroad employees such as that of this case will be deemed to have occurred in the scope of their employment.

"[T]he men [of a train crew] were waiting, doing nothing. It is argued that they were not on duty during this period.... But they were under orders, liable to be called upon at any moment, and not at liberty to go away. They were none the less on duty when inactive. Their duty was to stand and wait." (*Missouri, K. & T. Ry. Co.* v. *United States* (1913) 231 U.S. 112, 119 [58 L.Ed. 144, 147, 34 S.Ct. 26].) "'An employee is on duty under the Hours of Service Act when he is under orders and not at liberty to go away. He is none the less on duty even though inactive if the time is not his own.'" (*United States* v. *Pennsylvania Railroad Company* (W.D.Pa. 1967) 275 F.Supp. 345, 349.) "[T]hese men, while they moved from one place to another, did so under orders. They were at work and whether or not they operated an engine, or whether they rode in a taxi to be placed at some spot where the employer wanted them to operate a different engine is of no consequence. *Their time was not their own. It was consumed in behalf of their employer at its direction and for its presumed benefit. Whatever the engineer and fireman did, whether they sat or stood, or rode in a taxi, was done by direction of the employer, or if it was done while they were waiting for orders, they were ready to perform as directed, and they were at work within the meaning of the statute.*" (Italics add-

ed; *United States* v. *Pennsylvania Railroad Company* (W.D.Pa. 1967) 274 F.Supp. 164, 166.) (And to the same effect see *Chicago, R.I. & P. Ry. Co.* v. *United States* (8th Cir. 1918) 253 F. 555, 556; *United States* v. *Southern Pac. Co.* (9th Cir. 1917) 245 F. 722, 725; *United States* v. *Denver & R. G. R. Co.* (D.N.M. 1912) 197 F. 629, 631-632; *Elliott* v. *St. Louis Southwestern Railway Co.* (Mo. 1972) 487 S.W.2d 7, 13; *United States* v. *Pitcairn* (E.D.Mo. 1938) 23 F.Supp. 242, 243.)

Further, it is held to be of no consequence under the Hours of Service Act whether the employees are paid, or unpaid, while awaiting call to their work. So holding, the court in *United States* v. *Denver & R. G. R. Co., supra,* 197 F. 629, 631-632, stated: "Nor does it detract from this view that the men were paid nothing for this preliminary work. The defendant can hardly be heard to contend this in the face of its rule requiring this very service. Presumably, however, in fixing a rate of compensation beginning in terms only with the starting time, the employes and the railroad took into consideration the rule just mentioned, so that after all this preliminary work was not really done gratuitously, but was merged into a scale of wages mutually satisfactory to all concerned. At any rate, *labor does not cease to be such because not paid for, nor does duty cease to exist because performed without compensation in connection with duty for which there was compensation.*" (Italics added.)

■ It is now firmly held that whether an act was performed, or tort committed, in the scope of one's employment will depend upon all of the facts and circumstances of the case and such reasonable inferences as may be drawn therefrom. "'Whether the act was or was not such as to be within the employment's scope is ordinarily one of fact for the jury's determination.'" (*O'Shea* v. *Pacific Gas & Elec. Co.* (1936) 18 Cal.App.2d 32, 38 [62 P.2d 1066]; and see *Harvey* v. *D & L Construction Co., supra,* 251 Cal.App.2d 48, 52; *Boynton* v. *McKales, supra,* 139 Cal.App.2d 777, 790.)

As noted, the broad question of the superior court summary judgment proceedings was whether a triable issue of material fact appeared. (Code Civ. Proc., § 437c, 3d par.)

■ We hold that such a triable issue of fact appeared—whether plaintiff and Shannon were acting in the scope of their employment at the time of the accident causing plaintiff's alleged injuries. The superior

court erred in concluding that there was none, and in granting the company's motion for summary judgment.

The summary judgment is reversed.

Racanelli, P. J., and Grodin, J., concurred.